**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ramon NAVARRO, Defendant–Appellant.**

No. 95–2085.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 10, 1996.

Decided July 23, 1996.

Rehearing Denied Aug. 30, 1996.

Stephen J. Liccione, Michelle Leslie (argued), Office of the U.S. Atty., Milwaukee, WI, for Plaintiff–Appellee.

Charles W. Giesen, Morris D. Berman (argued), Giesen & Berman, Madison, WI, for Defendant–Appellant.

Before BAUER, FLAUM and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

When Ramon Navarro was arrested, law enforcement officers found three kilograms of cocaine in his truck. Later, they found thirty-six grams of cocaine in a baggie in his pocket and one ounce of cocaine and other drug paraphernalia at his farmhouse. He was convicted of conspiracy to distribute and to possess cocaine with the intent to distribute; he also was convicted of possession of cocaine. He now appeals the district court's denial of his motion to suppress, its admission of expert testimony at trial, and its denial of a reduction in his offense level under § 3B1.2 of the United States Sentencing Guidelines ("U.S.S.G."). As we explain in this opinion, we agree with the district court's rulings and therefore affirm its judgment.

I

A. *Facts*

Ramon Navarro was born in California. However, because he was raised in Mexico until he was eleven and attended school only one and one-half years, he claimed that his comprehension of English was poor. Nevertheless, during his twenty-four years of employment with Abbott Laboratories in Chicago, he spoke both English and Spanish on the job. Mr. Navarro owned a farm in Kenosha, Wisconsin, on which he raised horses and farm animals. This farm became the focal point of the drug transaction that is at the core of this case and that led to Mr. Navarro's arrest.

Officer John Siarkiewicz, a twenty-five-year veteran with the Oak Creek Police Department, had been working with the Drug Enforcement Administration ("DEA") Task Force in Milwaukee for nineteen months when this case began to unfold. On October 28, 1994, a confidential informant ("CI") who had assisted the police in prior arrests and drug seizures told Officer Siarkiewicz that a man named Leonel Ruiz would be delivering cocaine in the Milwaukee area during the middle of the next week. According to the CI, Ruiz would leave his home in Waukegan, Illinois and would stop at a farm along the way to pick up the cocaine. Because Ruiz probably did not have a driver's license, the CI suggested that someone else might drive him to Milwaukee. Two other informants also had provided information about Ruiz's drug-dealing activities that was consistent with this CI's report.

A few days later, on November 1, 1994, the CI and Officer Siarkiewicz drove to Waukegan together. The CI identified Ruiz's house and red Nissan automobile; he also pointed out the Kenosha County farm where, he claimed, Ruiz's cocaine supply was located. It was later determined that the farm belonged to Ramon Navarro.

A surveillance team of DEA officers and police watched Ruiz's house on November 2, 1994, but observed nothing of significance. On November 3, 1994, the CI notified the Task Force that something would happen soon. Officer Siarkiewicz and other DEA agents took up surveillance positions near Ruiz's residence. Special Agent William C. Hehr, a DEA agent for twenty-three years, observed from a single-engine plane above the residence. Around noon, Ruiz and a woman came out of Ruiz's house; neither one was carrying anything. The woman opened the gate at the end of the driveway and Ruiz drove away, by himself, in the red Nissan. As both ground and aerial surveilling agents tracked his travel north toward Milwaukee, Ruiz drove through Kenosha County to the farm that the CI had identified as Ruiz's cocaine source. He was observed getting out of his car at the farm and entering the house; he then got back into his car and drove it to a nearby outbuilding. Agent Hehr observed

from the air that two individuals stood next to the red car and then got into a black pickup truck and left the farm. The people in the truck were later identified as Ruiz and Navarro. The officer watched the truck drive north and pull into a service station. Picking up the surveillance, Officer Siarkiewicz followed the truck there in his car. At the service station Mr. Navarro's girlfriend, Brenda Wise, joined them and drove the truck toward Milwaukee.

The DEA officers previously had contacted Milwaukee County Deputy Sheriff Richard Angeles to advise him that a shipment of drugs might be transported into the county from the south on I-94. As the black pickup truck travelled toward Milwaukee, the agents apprised Deputies Angeles and Batchelder of the truck's route and progress. The agents instructed them to stop the truck after it entered Milwaukee County. Around 1:20 p.m., the deputies made the stop and asked the driver, Ms. Wise, for identification. Ms. Wise told them that she did not have her driver's license with her. However, she identified herself and introduced Mr. Navarro as the owner of the truck. The deputies returned to their squad car to verify this information; at that time the DEA agents instructed them to place the occupants of the truck under arrest.

The sheriff's deputies then arrested and handcuffed Ruiz and Mr. Navarro. Deputy Angeles told Mr. Navarro that he had received a tip that the truck contained narcotics and asked if he could look inside the pickup. Mr. Navarro gave his consent to search the truck. After placing the two men in the back of the squad car, the deputies searched the truck. Behind the seat of the pickup, Deputy Batchelder found a cardboard case, meant to hold twelve cans of beer, taped shut with duct tape. Inside the case was something wrapped in wax paper; it proved later to be three kilograms of cocaine. At that time, Agent Siarkiewicz arrived. He instructed the sheriff's deputies to transport Mr. Navarro, Ruiz and Wise to the DEA offices in Milwaukee for booking. When Mr. Navarro was patted down, agents found in his pocket a beeper and a baggie containing thirty-six grams of cocaine. Mr.

Navarro claimed that Ruiz had given him the cocaine to hold at the moment the police were pulling the truck over to the side of the road.

Mr. Navarro was interviewed by Agent Siarkiewicz shortly thereafter. The DEA agent and Mr. Navarro gave different accounts of that interview. The agent testified that, when the interview commenced, he advised Mr. Navarro of his *Miranda* rights by reading each one from his advice-of-rights card. He explained that, after each right was read, Mr. Navarro responded that he understood; Mr. Navarro then agreed to waive his rights and to talk to the agent. Officer Siarkiewicz stated that he had no trouble communicating with Mr. Navarro. However, he noticed Mr. Navarro's Spanish accent and therefore offered to provide an interpreter. Mr. Navarro stated that he understood the agent and did not need an interpreter. Mr. Navarro then told the officer that he did not know about the cocaine found in his truck. When Agent Siarkiewicz later asked if officers could search Mr. Navarro's home, he explained that, if Navarro refused, he could seek a search warrant from a judge. Mr. Navarro gave the agent permission; furthermore, he read and signed a consent-to-search form after Agent Hehr read the form to him. Agent Hehr described the atmosphere in the interview room as calm and relaxed and stated that he believed Mr. Navarro understood what the agents were saying. Agent Hehr also commented that Mr. Navarro reported that he had a gun in his house and asked whether that would bé held against him.

Mr. Navarro's description of this interview was markedly different. He testified that he was not advised of his *Miranda* rights until the end of the interview and that he did not understand that he had the right to refuse to cooperate. He also testified that the agents shouted at him and that Officer Siarkiewicz told him that, if he did not tell the truth, he would be sentenced to ten to thirty years in prison.

Agents Siarkiewicz and Hehr took Mr. Navarro to the Waukesha County Jail that evening. After the defendant was fingerprinted, the agents mentioned to Mr. Navarro that the beer carton filled with cocaine was being examined in the police lab and that, if Mr. Navarro's fingerprints were found on the carton, it would look bad for him. At that point, Mr. Navarro changed his story. He explained that he had put the carton in the truck, behind the back seat, as Ruiz had requested; therefore, it was possible that his fingerprints would be on the twelve-pack, but he did not know what was in it. He also stated that the agents would find cocaine at his home because Ruiz had given Mr. Navarro an ounce of cocaine when he came to the farm that day. At trial, Mr. Navarro's explanation again changed. He testified that Ruiz had asked him to put duct tape on the end of the beer carton while they were at the farm, but that he had no idea that the carton contained cocaine. He also explained that Ruiz left cocaine at the farm because he did not want it with him when he travelled to Milwaukee.

In their search of Mr. Navarro's farm, the agents found in the master bedroom a scale and one ounce of cocaine in a boot in the closet, $5,000 in envelopes between the mattress and boxspring, a bottle of inositol on top of the dresser, and two handguns in a dresser drawer. In the entryway to the home, the officers found seven corner-cut plastic baggies. In the truck they found another bottle of inositol. The narcotics expert at trial, Chicago DEA Agent Robert Fanter, testified about the packaging, pricing and "tools of the trade" for cocaine trafficking; he explained, for example, the use of inositol, scales, weapons, beepers and corner-cut baggies. Mr. Navarro had explanations for the presence of those items in his home: The $5,000 was from the sale of a horse, the guns were being held for a boarder on the farm, the inositol was a vitamin supplement, and the scale was used to weigh chickens. The defendant also testified that he took Ruiz to Milwaukee because Ruiz needed a ride and because Mr. Navarro wanted to look at a wrecked car that Ms. Wise was considering buying to fix up. This testimony was different from his earlier explanation to Agent Siarkiewicz that he drove Ruiz because Ruiz's hand was in a cast and he was uncomfortable driving.

Mr. Navarro's girlfriend, Brenda Wise, also testified at trial. Her testimony concerning the events of November 3, 1993, conformed with that of Mr. Navarro. When asked whether she would consider Mr. Navarro to be fluent in English, she answered, "Not on big words." R.94 at 283. Both at trial and at the earlier suppression hearing, Ms. Wise made clear that she knew little Spanish and that she and Mr. Navarro communicated in English.

## B. Judicial Decisions

Ramon Navarro was indicted on two counts: conspiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2; and possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.[1] In pretrial motions Mr. Navarro sought to suppress physical evidence and statements. He also moved for disclosure of certain evidence, including expert testimony, and of the identity of confidential informants. Following an evidentiary hearing on the motions, the magistrate judge issued a Report and Recommendation recommending that all Mr. Navarro's motions be denied. The magistrate judge found that Mr. Navarro had consented knowingly and voluntarily to a search of his property and that he voluntarily had waived his *Miranda* rights, thereby rendering his statements knowing and voluntary. In addition, because Mr. Navarro's counsel had stated that his motion and demand for disclosure were moot, the magistrate judge denied the motion as moot. The district court adopted the magistrate judge's Report and Recommendation in its entirety.

Mr. Navarro's jury trial began on February 7, 1995. After a three-day trial, the jury found Mr. Navarro guilty on both counts. On April 25, 1995, the district court sentenced Mr. Navarro to two seventy-eight-month terms of imprisonment to run concurrently, four years of supervised release, and a $2,900 fine. Mr. Navarro appeals the district court's denial of the motions to suppress evidence and statements, its admission of

Agent Fanter's expert testimony at trial, and its denial of an offense level reduction for minimal or minor participation in the conspiracy under U.S.S.G. § 3B1.2.

## II

## DISCUSSION

### A. Pretrial Issue: Suppression of Evidence and Statements

Mr. Navarro submits that his Fourth and Fifth Amendment rights were violated by the law enforcement officers who initially stopped and searched his truck, interrogated him at the Milwaukee DEA office, and searched his farm. As a result, he asserts, all the evidence obtained directly from those acts, as well as any leads derived from the evidence found, should have been suppressed by the district court.

▪ The district court's denial of Mr. Navarro's motion to suppress evidence from the stop and search of Mr. Navarro's truck was based upon its finding that probable cause existed to believe that Mr. Navarro's vehicle contained contraband. Our review of that determination is *de novo*.

> [A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal. Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.

*Ornelas v. United States*, — U.S. —, —, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996). The Supreme Court stated that it is not possible to articulate a precise definition of "probable cause" or "reasonable suspicion" because they are "fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed," *id.* at —, 116 S.Ct. at 1661, but noted that probable cause exists "where the known facts and circumstances are sufficient

---

1. Leonel Ruiz was also indicted on those counts. Mr. Navarro's pretrial motion to sever his trial from that of codefendant Ruiz was denied; however, on the morning that trial was to commence the district court granted Ruiz's motion to sever.

to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Id.* (citing *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949) and *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). We defer to the findings of the district court with respect to matters of historical fact because that court had occasion to hear the witnesses and to observe their demeanor. *United States v. Willis,* 61 F.3d 526, 529 (7th Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2528, 135 L.Ed.2d 1052 (1996). "When there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

### 1. The Initial Stop, Arrest and Search of Truck

Mr. Navarro first submits that the cocaine found in his truck should have been suppressed because the police lacked probable cause to stop and to search his truck and to arrest him. According to Mr. Navarro, the information given by the informants was scanty; moreover, it focused on Ruiz without naming Mr. Navarro or relating his involvement in Ruiz's drug trafficking activities. Mr. Navarro points out that there was no corroboration of the informant's claim that Ruiz did not have a driver's license and there was no observation of anyone putting a package with drugs into Mr. Navarro's truck or Ruiz's car. Mr. Navarro concedes that there are circumstances in which an anonymous tip would be sufficiently reliable to provide reasonable suspicion for an investigatory stop, but only, he insists, if the tip is corroborated by independent police work. Mr. Navarro's challenge thus focuses our attention on the reliability of the confidential informants' tips in this case and on the corroboration of that information by the DEA task force and other officers involved in the search and arrest.

#### a.

■ A vehicle may be stopped and searched without a warrant if there is proba-

ble cause to believe the vehicle contains contraband or other evidence of illegal activity. *United States v. Young,* 38 F.3d 338, 340 (7th Cir.1994) (citing *Carroll v. United States,* 267 U.S. 132, 153–56, 45 S.Ct. 280, 285–86, 69 L.Ed. 543 (1925)). The search of the vehicle may be "as thorough as a magistrate could authorize in a warrant 'particularly describing the place to be searched.'" *United States v. Ross,* 456 U.S. 798, 800, 102 S.Ct. 2157, 2160, 72 L.Ed.2d 572 (1982). Probable cause exists if, under the totality of the circumstances, "including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).

In *Gates,* the Supreme Court held that a highly detailed tip from an anonymous informant that was corroborated by independent police work is enough to establish probable cause to search. *Id.* at 246, 103 S.Ct. at 2336; *see also California v. Acevedo,* 500 U.S. 565, 579–80, 111 S.Ct. 1982, 1990, 114 L.Ed.2d 619 (1991). In *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), the Court then set forth the proper approach for analyzing the reliability of a tip:

> [I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable. The *Gates* Court applied its totality-of-the-circumstances approach in this manner, taking into account the facts known to the officers from personal observation, and giving the anonymous tip the weight it deserved in light of its indicia of reliability as established through independent police work. The same approach applies in the reasonable-suspicion context, the only difference being the level of suspicion that must be established.

*White,* 496 U.S. at 330–31, 110 S.Ct. at 2416–17.[2]

---

**2.** In *Alabama v. White,* Justice White wrote for the Court that both reasonable suspicion and

probable cause were based on "the content of information possessed by police and its degree of

b.

■ The district court was required, therefore, to consider the informant's information—in amount and in degree of reliability—and the degree of corroboration of that information by the officers. The magistrate judge found that Officer Siarkiewicz had information from three sources that Ruiz was a drug trafficker.[3] The most complete information, which came from a known and reliable confidential informant rather than from an anonymous source, proved to be detailed and accurate and was consistent with the information from the other informants. Days before the drug transaction the CI had identified Ruiz and his car, had traced the route Ruiz would take, and had identified Mr. Navarro's farm as the source of the cocaine. Even if the CI did not name Mr. Navarro, the facts he provided were sufficient, in the totality of the circumstances, to establish his relationship to Ruiz and probable involvement in the delivery of cocaine to Milwaukee. As the magistrate judge noted, "Everything transpired as the CI described." R.53 at 8. In addition, virtually every detail of the CI's information was independently corroborated each step of the way by the surveilling officers who followed Ruiz to Mr. Navarro's farm, followed Mr. Navarro's truck to Milwaukee, and identified that truck for the officers who made the initial stop.

■ Mr. Navarro submits that this activity, without the agents' actual knowledge that drugs were being transported, was simply an innocent trip to Milwaukee that fails to give rise to probable cause. This submission reflects a misunderstanding of the probable cause determination. The fact that agents did not see the cocaine placed in the truck does not diminish the significance of the CI's detailed information regarding Ruiz's plan to deliver cocaine to Milwaukee. When we consider the detail of the CI's report in the "totality of the circumstances," taking into account the informant's veracity, reliability and basis of knowledge, we readily conclude that the informant proved himself to be reliable about the facts that were corroborated and "more probably right about other facts," see Gates, 462 U.S. at 244, 103 S.Ct. at 2335, such as the fact that there was cocaine in the truck. "Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. at 243–44 n. 13, 103 S.Ct. at 2335 n. 13. Moreover, as in White and Gates, the tip contained specific details about future actions of Navarro and Ruiz that were not easily predicted, demonstrating "inside information." White, 496 U.S. at 332, 110 S.Ct. at 2417; Gates, 462 U.S. at 245, 103 S.Ct. at 2335–36. Therefore, when Ruiz followed the path that the CI had reported he would take, arrived at Mr. Navarro's farm (alleged to be the source of the cocaine) and then headed for Milwaukee with another person driving, as the CI had predicted, it was enough that the law enforcement officers fully confirmed those details before stopping Mr. Navarro's truck, for "'seemingly innocent activity became suspicious in light of the initial tip.'" Gates, 462 U.S. at 243 n. 13, 103 S.Ct. at 2335 n. 13 (agreeing with dissenting opinion in People v. Gates, 85 Ill.2d 376, 53 Ill.Dec. 218, 227, 423 N.E.2d 887, 896 (1981) (Moran, J.,

reliability." 496 U.S. at 330, 110 S.Ct. at 2416. In addition, "both factors—quantity and quality—are considered in the 'totality of the circumstances—the whole picture.'" Id. (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). The White Court explained the differences in the "reasonable suspicion" and "probable cause" standards:

Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

496 U.S. at 330, 110 S.Ct. at 2416. Thus, it noted, an unverified tip from a known informant might be sufficiently reliable to justify a Terry stop but not a full search that requires probable cause. See Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972).

3. All three informants had provided reliable information to DEA agents in the past. Two informants had told Officer Siarkiewicz that Leonel Ruiz was a supplier of cocaine to the Milwaukee area. The third had presented the detailed factual plan of Ruiz's cocaine pick-up at Mr. Navarro's farm and delivery to Milwaukee. Furthermore, he had driven the officer on the route Ruiz had planned to take for his narcotics transaction.

dissenting)). We conclude that the CI's detailed tip, highly reliable in its own right and thoroughly verified by independent police work, provided probable cause for the police to stop the vehicle and to search it for contraband. Therefore, because the officers had probable cause to stop the vehicle and search for the contraband, it was not necessary for them to have the consent of the owner of the vehicle. The existence of probable cause satisfied the requirements of the Fourth Amendment. The search required either a warrant, consent to search, or probable cause to believe the truck contained drugs; once probable cause was found for the warrantless search, consent was unnecessary.[4]

In any event, the consent that the officers did obtain from Mr. Navarro was not tainted by an arrest that was illegal.

Mr. Navarro's contention that there was not probable cause to arrest him is based on the same arguments presented above: Because the surveilling officers did not see Mr. Navarro or Ruiz place a package into the truck before they left for Milwaukee, the only evidence they had was that the two men were travelling to Milwaukee—an innocent activity. We have already concluded that this argument lacks merit; actual evidence of narcotics is not required in a probable cause determination.

A warrantless arrest, like a warrantless search, must be supported by probable cause. *Michigan v. Summers,* 452 U.S. 692, 700, 101 S.Ct. 2587, 2593, 69 L.Ed.2d 340 (1981); *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964). "In order to make an arrest without a warrant, the police must have probable cause, under the totality of the circumstances, to reasonably believe that a particular individual has committed a crime." *United States v. Gilbert,* 45 F.3d 1163, 1166 (7th Cir.1995). We assess the determination of probable cause for a search or an arrest under the common-sense "totality of the circumstances" *Gates* analysis: "whether, given all of the circumstances set forth ..., there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332; *see Gilbert,* 45 F.3d at 1166.

> Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.

*Beck,* 379 U.S. at 91, 85 S.Ct. at 225–26. An informant's tip, if reliable, is considered trustworthy information under *Gates* and *White. See United States v. Scott,* 19 F.3d 1238, 1242 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 163, 130 L.Ed.2d 101 (1994). The record firmly establishes the reliability of this informant's accurate and detailed tip; because the surveillance preceding the stop corroborated the information from the informant, the law enforcement officers had probable cause for both the arrest and search. *See Scott,* 19 F.3d at 1242 (noting that isolated pieces of conduct may have appeared innocent, but that police properly viewed that conduct as a whole and concluded that the defendant was trafficking in illegal drugs). In our de novo review of the probable cause determination, we find no error in the magistrate judge's findings of fact. Having given "due weight to the inferences drawn from those facts by the judges and the local law enforcement officers," as required by *Ornelas,* —— U.S. at ——, 116 S.Ct. at 1663, we affirm the district court's adoption of the magistrate judge's succinct conclusion, based

---

**4.** See *United States v. Ross,* 456 U.S. 798, 809, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (explaining that, under the automobile exception established in *Carroll,* a warrantless search of a vehicle is not unreasonable if supported by probable cause, i.e., "based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained"); *Almeida–Sanchez v. United States,* 413 U.S. 266, 273, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (holding that a search of a vehicle could be conducted without consent only if there was probable cause or a judicial warrant authorizing the search); *United States v. Moralez,* 964 F.2d 677, 681 n. 3 (7th Cir.), *cert. denied,* 506 U.S. 903, 113 S.Ct. 293, 121 L.Ed.2d 217 (1992) (stating that, when consent is given, probable cause is unnecessary).

on her review of the totality of the circumstances, that "both the immediate arrest and the subsequent search were justified by the initial informant information and the 'confluence of corroborative facts' observed by the surveillance team." R.55 at 8–9 (quoting *Young*, 38 F.3d at 341).

c.

Mr. Navarro next submits that, even if there was probable cause to arrest Ruiz, there was no particularized probable cause to arrest Mr. Navarro. The informants never mentioned Mr. Navarro, he asserts, and his mere association with a known criminal does not, by itself, create probable cause for arrest. Relying on *United States v. Ramirez*, 963 F.2d 693, 698 (5th Cir.), *cert. denied*, 506 U.S. 944, 113 S.Ct. 388, 121 L.Ed.2d 296 (1992), the defendant insists there must be additional circumstances from which it is reasonable to infer participation in the criminal enterprise. *Id.*

Mr. Navarro's reliance on *Ramirez* is in no way beneficial to him. *Ramirez* concluded that the officers reasonably could have believed that the defendant was implicated in the conspiracy because he was seen in the company of suspected drug traffickers and was in fact meeting with those suspects while they were engaged in an ongoing conspiracy. *Id.* at 698–99. Here the case for probable cause is strong; the officers reasonably could have believed that Mr. Navarro was implicated in the conspiracy because he provided the transportation for delivery of Ruiz's cocaine and travelled to Milwaukee with him for the delivery. *See also United States v. Covarrubias*, 65 F.3d 1362, 1368 (7th Cir.1995) (concluding that officer had probable cause to arrest passenger who was owner of car transporting marijuana, based on facts and circumstances within the officer's knowledge at the time); *United States v. Lima*, 819 F.2d 687, 689–90 (7th Cir.1987) (rejecting "mere association" claim of defendant because other circumstances were sufficient to establish probable cause to arrest). The CI had provided detailed, reliable information about Ruiz's cocaine dealings, about this cocaine delivery to Milwaukee, and about the cocaine source—Mr. Navarro's farm. Mr. Navarro's association with Ruiz on the trip to Milwaukee therefore reflects far more than "mere association." The circumstances within the knowledge of the officers at that time, combined with the trustworthy information they had from the CI, warranted their belief that Mr. Navarro, along with Ruiz, was committing an offense.

We hold that the district court properly concluded that there was probable cause for the stop, warrantless search and arrest. Therefore, the district court properly denied Mr. Navarro's motion to suppress evidence found in the pickup truck.[5]

2. Consensual Search of House

■ Mr. Navarro next submits that his consent to search his home, given in the DEA Office interrogation room, was not voluntary. He claims that the agents shouted at him, threatened him with the prospect of a long prison sentence, and told him that they would get a search warrant if he did not sign. He also asserts that he did not understand the consent form he signed because his command of English is so poor. Therefore, Mr. Navarro contends, the district court erred in not suppressing the physical evidence obtained from the search of his house.

---

5. Because we have determined that the police had probable cause to effect an arrest of Mr. Navarro, we need not address the question of whether the "sliding scale" approach to the law of search and seizure outlined in *United States v. Chaidez*, 919 F.2d 1193 (7th Cir.1990), *cert. denied*, 502 U.S. 872, 112 S.Ct. 209, 116 L.Ed.2d 167 (1991), survives the plenary description of probable cause and reasonable suspicion in the *Ornelas v. United States*, — U.S. —, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). In *Ornelas*, the Supreme Court stated that it is not possible to articulate a precise definition of "probable cause" or "reasonable suspicion" because they are "fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed," *id.* at —, 116 S.Ct. at 1661, but noted that probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Id.* (citing *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) and *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

■ Under the established law of this circuit, we review the question of voluntariness of a consent to search for clear error, *United States v. Saadeh*, 61 F.3d 510, 517 (7th Cir.), *cert. denied*, ── U.S. ──, 116 S.Ct. 521, 133 L.Ed.2d 428 (1995), because it is "a question of fact to be determined from the totality of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973); *United States v. Willis*, 61 F.3d 526, 531 (7th Cir.1995), *cert. denied*, ── U.S. ──, 116 S.Ct. 2528, 135 L.Ed.2d 1052 (1996); *United States v. Betts*, 16 F.3d 748, 753 (7th Cir. 1994).[6] The consent must have been given freely. The government bears the burden of proving voluntariness by a preponderance of the evidence. *Schneckloth*, 412 U.S. at 222, 93 S.Ct. at 2045; *Willis*, 61 F.3d at 531; *Saadeh*, 61 F.3d at 517.

■ The circumstances that must be examined when considering whether the consent was voluntary or coerced include such factors as the defendant's age, education and intelligence, the advisement of his rights, his custodial status, and the length and possible coercive nature of his detention prior to his consent. *United States v. LaGrone*, 43 F.3d 332, 333–34 (7th Cir.1994); *United States v. Kozinski*, 16 F.3d 795, 810 (7th Cir.1994). Mr. Navarro's claims focus on two of those categories: the coercive police behavior when he was being interviewed and his inability to

understand the written consent form because he understood very little English and had very little formal education.[7]

The magistrate judge did not believe that the atmosphere in the DEA interrogation room was coercive. Officer Siarkiewicz's statement that Mr. Navarro could get ten, twenty or thirty years in prison if he did not speak truthfully, while hyperbolic, cannot, in itself, be considered coercive.[8] Mr. Navarro makes no claim, and the record does not reflect, that he was subjected to threats, physical abuse, lengthy detention, or prolonged questioning. *See Saadeh*, 61 F.3d at 518. The defendant's discomfort or feeling of constraint during the interrogation does not inevitably lead to the conclusion that he could not consent voluntarily to a search. *United States v. Quinones–Sandoval*, 943 F.2d 771, 775 (7th Cir.1991); see also *United States v. Duran*, 957 F.2d 499, 503 (7th Cir. 1992) ("[T]he fact that a consenting party is extremely upset at the time she consents is not dispositive."). The magistrate judge noted that Mr. Navarro testified that he overheard conversations taking place in an adjacent room and that Agent Hehr testified that the atmosphere was calm and relaxed when he entered the interview room. Because such testimony "undermines [Mr. Navarro's] claim that there was a lot of shouting and an excited atmosphere," the magistrate judge

---

**6.** Neither party has suggested that the Supreme Court's recent decision in *Ornelas v. United States*, ── U.S. ──, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), has altered this standard. We note that, in the wake of *Ornelas*, the Supreme Court has directed this circuit to reassess its precedent that the voluntariness of a confession is a question of fact that is subject to the clearly erroneous standard. *See Baldwin v. United States*, ── U.S. ──, 116 S.Ct. 1873, 135 L.Ed.2d 169 (1996). If *Ornelas* requires that the voluntariness of a confession is a matter that the courts of appeals must review *de novo*, we shall have to reassess our holdings that the voluntariness of a confession is, under all circumstances, a matter subject to deferential review. Although *Schneckloth* terms the issue of consent an issue of fact to be determined from all the circumstances, it does not speak directly to the standard of appellate review. *See* Wayne R. LaFave, 5 *Search and Seizure* § 11.7(c) (3d ed.1996). Because the matter has not been briefed or argued in this case and because we do not believe the standard of review is outcome-determinative

here, we shall assume that the standard in the cases cited has remained unchanged. We would reach the same result, however, under a de novo standard of review. In the context of this case, the matter of consent is, to a very significant extent, a credibility judgment with respect to matters of historical fact. On such matters, *Ornelas* directs that we must give deference to the decision of the judicial officer who heard and observed the witness.

**7.** These assertions were raised in Mr. Navarro's challenges to both the waiver of his *Miranda* rights and the consent to search.

**8.** Taking into consideration only the amount of cocaine in this case (2–3.5 kilos), the appropriate U.S.S.G. level is 28 and the sentencing range is 78–175 months (6.5–14.6 years). Mr. Navarro did have a record of a prior felony; nevertheless, the officer's statement nearly was double the sentence Mr. Navarro really would have received. The court sentenced him at level 28 and at the lowest range, 78 to 97 months.

concluded that "this was an atmosphere of calculated cooperation on the defendant's part, not unabashed coercion as he suggests." R.55 at 12.

In addition, the magistrate judge did not believe Mr. Navarro's claim that he understood and spoke very little English. Ample evidence in the record supports her conclusion. She found that Mr. Navarro has spoken English in the workplace at Abbott Labs for more than twenty years and with his girlfriend for seven years; that he refused an interpreter when one was offered to him at the initial interview; and that he responded appropriately in English to the questions of counsel. Our review of the suppression hearing transcript confirms the magistrate judge's assessment. *See United States v. Garcia,* 897 F.2d 1413, 1419 (7th Cir.1990) (finding voluntary the consent of a defendant who claimed he could not understand English but conversed with troopers in English for lengthy periods); *see also United States v. Riascos–Suarez,* 73 F.3d 616, 625 (6th Cir. 1996), *petition for cert. filed,* —— U.S.L.W. —— (U.S. June 11, 1996) (No. 95–9285) (finding that defendant had no difficulty responding in English, despite his denials, and that he voluntarily consented). We note as well that Mr. Navarro did not need an interpreter at the suppression hearing or at trial.

Finally, we note that Mr. Navarro signed a written consent form permitting the search that explicitly stated: "I sign this form freely and voluntarily." He signed this form only after Agent Hehr read through the document and Mr. Navarro told him he understood it. This signed statement, under these circumstances, is clear evidence of the voluntariness of Mr. Navarro's consent. *See Saadeh,* 61 F.3d at 518 (noting signed consent form stating "I freely consent to this search" as a factor indicating voluntariness); *Duran,* 957 F.2d at 502 (noting that signed consent form, informing defendant that she had a right to withhold consent, weighed heavily in favor of finding her consent voluntary). As the magistrate judge pointed out, [a]lthough the defendant may have limited comprehension of written materials, Agent Hehr read and explained the written consent form to him. The form indicates that

the defendant had been advised of his rights and understood them. The form also clearly sets forth the parameters of the search, much like a search warrant would specify the places to be searched and the object of the search.

R.55 at 13. The magistrate judge noted that, even though Mr. Navarro was not told that he could refuse to grant a consent to search, the failure to provide such advice does not prove the consent was involuntary. *Id.* (citing *Schneckloth,* 412 U.S. at 231, 93 S.Ct. at 2049–50). On that point the magistrate judge correctly stated the law of this circuit: The "failure to inform a suspect of his right to refuse to consent to a search does not invalidate a consent that is voluntary." *United States v. Baker,* 78 F.3d 1241, 1245 (7th Cir.1996); *see also Saadeh,* 61 F.3d at 518 (stating that "the police were not constitutionally required to advise [the defendant] that she had the right to refuse a search before procuring her consent"); *Betts,* 16 F.3d at 754 (same). We also agree with the magistrate judge that the officer fairly informed Mr. Navarro that law enforcement agents could seek a search warrant if Mr. Navarro did not consent to a search of his farm. Such information, based on the circumstances of the arrest of the defendants and search of the vehicle, was not a baseless threat that could have rendered Mr. Navarro's subsequent consent involuntary. *See Saadeh,* 61 F.3d at 518. The magistrate judge concluded that Mr. Navarro's consent was voluntary:

> From all appearances, the defendant was trying to dispel suspicions by being cooperative with the officers. In fact, he told the officers that some cocaine would be found at his house and where.

R.55 at 14. The magistrate judge's factual and credibility findings, adopted by the district court in their entirety, were comprehensive and detailed. After a "careful scrutiny of all the surrounding circumstances," *Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047, we conclude that the record establishes that Mr. Navarro's consent was voluntary. We hold that the district court did not err in concluding that Mr. Navarro knowingly and

# 1258

voluntarily consented to the search of his property.

### 3. Voluntariness of the Defendant's Statement

■ His final argument concerning the denial of his motion to suppress is that the government did not prove that, during the custodial interrogation, Mr. Navarro waived his rights to an attorney and against self-incrimination. He asserts that the officer did not read him his *Miranda* rights until the end of the interview. He also raises again the claims that Officer Siarkiewicz shouted at him and threatened him with a prison term of ten to thirty years if he did not tell the truth, and that he was unable to understand because of his lack of education, lack of English comprehension, and lack of awareness of his rights.

■ Officer Siarkiewicz testified that, during his interview with Mr. Navarro, he followed his routine practice of advising the suspect of his *Miranda* rights at the beginning of the interview by reading each right from a card and then asking him if he understood that right. The magistrate judge expressly found Officer Siarkiewicz the more credible witness on this issue. "The trial judge's choice of whom to believe is conclusive on appeal unless the judge has credited exceedingly improbable testimony." *United States v. Veras,* 51 F.3d 1365, 1371 (7th Cir. 1995).

The magistrate judge further concluded that Mr. Navarro understood and voluntarily waived his *Miranda* rights. She found that the defendant's comprehension of English was sufficient; that Officer Siarkiewicz's statement concerning the possible length of Mr. Navarro's prison term was neither deceptive nor coercive; that the atmosphere during the interview was not coercive; and that Mr. Navarro's nervousness during the interview did not lead to an involuntary waiver of his *Miranda* rights. The district court adopted the magistrate judge's findings and conclusions that Mr. Navarro's will was not

overborne in this case and that his waiver of *Miranda* rights and subsequent statements were made knowingly and voluntarily. On appeal, Mr. Navarro simply reiterates the facts the magistrate judge rejected. He offers no basis in the record for overturning the magistrate judge's factual and credibility determinations. We conclude that the historical findings of fact of the magistrate judge, approved by the district court, are not clearly erroneous. Whether we review the voluntariness of the confession under a de novo or a deferential standard,[9] we must leave undisturbed the determination of the trial court. Mr. Navarro waived voluntarily his right to remain silent.

In sum, the district court correctly denied the motion to suppress.

### B. Trial Issue: Admission of Expert Witness Testimony

■ Special Agent Robert Fanter, a twenty-two year veteran of the Drug Enforcement Administration, testified at trial as an expert witness and gave his opinion, based on his experience, concerning narcotics trafficking and the "tools of the trade" in the cocaine distribution industry. Mr. Navarro challenges the court's admission of Special Agent Fanter's testimony as an expert at trial on several grounds. We address each below. At the outset, however, we note that the customary standard for appellate review of a trial court's ruling on the admission of expert testimony is for an abuse of its discretion. *United States v. Haywood,* 70 F.3d 507, 509 (7th Cir.1995); *Willis,* 61 F.3d at 533. There is an additional consideration here. Mr. Navarro's submissions concerning Agent Fanter are being raised for the first time on appeal. Accordingly, because these objections were not raised in the district court, we must limit our review to determining whether the admission of this testimony was plain error. *United States v. Nobles,* 69 F.3d 172, 182–83 (7th Cir.1995) (reviewing admission of expert testimony for plain error

---

**9.** The Supreme Court recently vacated the holdings of this court that the issue of the voluntariness of a confession is to be reviewed deferentially and directed this court to reevaluate those holdings in light of its recent decision in *Ornelas.* See *Baldwin v. United States,* —— U.S. ——, 116 S.Ct. 1873, 135 L.Ed.2d 169 (1996).

because no objection to expert's qualifications was raised).

### 1. Motion and Demand for Disclosure

▮ Mr. Navarro first claims that Agent Fanter's testimony should have been barred because it was not disclosed before trial. Mr. Navarro filed a pretrial Motion and Demand for Disclosure "demand[ing] that the government disclose whether it intends to rely upon ... any expert testimony ... and the facts and data upon which such witnesses will rely to base their opinion." R.30 at 4. The government responded that it was "following its open file policy" and had provided Mr. Navarro with all discovery in this case. R.50 at 12. At the suppression hearing the government reiterated that it was providing anything it had and that the issue was moot. Defense counsel responded, "I would agree that that is mooted." *Id.* On that basis the magistrate judge ruled: "So the court then, based on the statements of counsel and representations herein, will deny that motion and demand for disclosure as moot." R.58 at 99.

Mr. Navarro asserts that the denial of that request was error under Federal Rule of Criminal Procedure 16(a)(1)(E), which provides:

> At the defendant's request, the government shall disclose to the defendant a written summary of testimony the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case in chief at trial. This summary must describe the witnesses' opinions, the bases and reasons therefor, and the witnesses' qualifications.

According to Mr. Navarro, no such summary was furnished by the government. The government responds that it was not required to comply with Rule 16(a)(1)(E) for two reasons. First, the defendant did not request a written summary of expert testimony as the rule requires. *See United States v. Cross,* 50 F.3d 81, 83 (1st Cir.1995) ("The duty to disclose under Rule 16 is triggered by a proper request."). The only subsections of Rule 16

cited by the defendant in his motion were Rule 16(a)(1)(A),[10] (a)(1)(C),[11] and (a)(1)(D).[12] Second, defense counsel stated at the suppression hearing that the discovery motion was moot because he had received all the material he had requested.

As we have noted earlier, although we usually review a district court's ruling concerning a discovery motion under Rule 16 of the Federal Rules of Criminal Procedure for an abuse of discretion, *United States v. Jackson,* 51 F.3d 646, 651 (7th Cir.1995), in this case our review is limited to plain error because the issue was not preserved for appeal by objection in the district court. Under that standard, we cannot say that the situation here warrants reversal. Even if we were to read Mr. Navarro's demand for disclosure of opinion testimony as a Rule 16(a)(1)(E) demand, it appears that the defendant abandoned whatever claim he may have had under that rule by agreeing with government counsel that the motion was moot. There was no plain error in the court's denial of the motion for disclosure based on the representations of both counsel that the issue was moot.

▮ We note as well that the defense conducted a thorough cross-examination of the witness. Indeed, Mr. Navarro has not alleged any prejudice, and we can see none. Moreover, the evidence at trial, independent of Agent Fanter's testimony, was itself sufficient to support the jury's inference that Mr. Navarro intended to distribute cocaine. *See United States v. Glenn,* 64 F.3d 706, 711 (D.C.Cir.1995) (finding no unfair prejudice in light of the possession evidence at trial). We conclude that neither error nor prejudice resulted from Mr. Navarro's failure to receive a Rule 16(a)(1)(E) summary of Agent Fanter's testimony.

### 2. Opinion on Defendant's Mental State

▮ Mr. Navarro's second submission is that Agent Fanter's testimony violated Rule 704(b) of the Federal Rules of Evidence.

---

10. Statement of the Defendant

11. Documents and Tangible Objects

12. Reports of Examination and Tests

**1260**

### Rule 704. Opinion on Ultimate Issue

\* \* \* \* \* \*

(b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Mr. Navarro contends that Agent Fanter stated or implied an opinion that the defendant had the mental state of intent to distribute that constituted an element of the crime charged. Mr. Navarro offers three examples of Agent Fanter's testimony that suggested the defendant's mental state: (1) The DEA agent considered an ounce of cocaine not to be a personal use quantity; (2) he opined that baggies, with the corners cut, were a way of packaging drugs; and (3) he denied that inositol (which could be a cutting agent) was used by a person who used cocaine solely for personal use. The clear inference from that testimony, asserts Mr. Navarro, was that he possessed those amounts of cocaine with the intent to distribute. Such an inquiry, he contends, went beyond the permissible limits set by Rule 704(b). The admission of such testimony, he contends, requires reversal.

We cannot accept Mr. Navarro's characterization of the agent's testimony. Nothing in the agent's testimony is a comment, direct or implied, on Mr. Navarro's mental state, an element of the crime charged. Agent Fanter did not give an opinion about Mr. Navarro's intent to distribute cocaine.[13] The witness did give an opinion about the nature of the defendant's activities, but made it clear "that the opinion is based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes." *Willis*, 61 F.3d at 533 (quoting *United States v. Lipscomb*, 14 F.3d 1236, 1242 (7th Cir.1994)). The court carefully monitored the testimony of Agent Fanter and sustained defense counsel's objections when it agreed that the opinion sought was infringing on the province of the jury. We find neither plain error in the court's admission of that expert opinion testimony nor prejudice caused by that testimony.[14]

#### 3. Speculative Expert Testimony

Mr. Navarro also submits that the opinion testimony of Agent Fanter should have been ruled inadmissible under Rule 702 of the Federal Rules of Evidence:

### Rule 702. Testimony by Experts

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience,

---

**13.** *See United States v. Hubbard*, 61 F.3d 1261, 1274–75 (7th Cir.1995), *cert. denied*, — U.S. ——, 116 S.Ct. 1268, 134 L.Ed.2d 216 (1996); *United States v. Lipscomb*, 14 F.3d 1236, 1240 (7th Cir.1994) (noting that the magic words "intent" and "intended" trigger application of Rule 704(b)).

**14.** The District of Columbia Circuit case on which Navarro relies, *United States v. Boyd*, 55 F.3d 667 (D.C.Cir.1995), does not allow the government to "recite a list of 'hypothetical' facts that exactly mirror the case at hand and then ask an expert to give an opinion as to whether such facts prove an intention to distribute narcotics." 55 F.3d at 672. In *Boyd*, the facts concerning the defendant's role in the criminal activity were ambiguous, and the court refused expert testimony designed to elicit testimony on the issue of the defendant's intent by posing a hypothetical that recited the exact facts of that case. The court noted that, "expert testimony on the ultimate issue of fact is likely to have a powerful effect on the result" and that "it is the jurors (not the expert) who must decide the ultimate issue of fact." *Id. Boyd* is different from our case; it simply acknowledges that there is "a line that expert witnesses may not cross." *Id.* at 671. Notably, the court specifically acknowledged that "expert testimony concerning the modus operandi of individuals involved in drug trafficking does not violate Rule 704(b)." *Id.* Here the expert testified to the modus operandi of drug traffickers but left the ultimate issue of fact to the jury. We note that, in a later case decided by the D.C. Circuit, one "where the opinion evidence adduced was almost identical to the evidence" in *Boyd*, the court concluded that, under the plain error standard of review, "[the defendant] was not prejudiced in view of the possession evidence which ... was itself sufficient to support the jury's inference that he intended to distribute the drugs." *United States v. Glenn*, 64 F.3d 706, 711 (D.C.Cir.1995).

training, or education, may testify thereto in the form of an opinion or otherwise. According to the defendant, Agent Fanter's testimony was simply his subjective belief and was "rife with speculative qualities" that are inadmissible. Appellant's Br. at 26. Mr. Navarro offers three examples of statements for which no foundation was laid: (1) The baggies, which did not seem to contain any incriminating cocaine residue, might have been cleaned; (2) the baggies at one time smelled of ether (a drying agent for cocaine), and Agent Fanter opined that they could have gotten that scent by being close to a larger amount of cocaine; and (3) Hispanics will give permission to search more readily than most people.

■■■■■ Under Rule 702, expert testimony may be admitted if the witness' expertise is helpful to the jury's understanding of the case. Law enforcement officers therefore may qualify as experts in narcotics trafficking and may offer explanations to the jury.

Federal Rule of Evidence 702 "permit[s] the admission of the opinion testimony of a witness qualified by the court as an expert if the witness' specialized knowledge will assist the trier of fact to understand the evidence in the case." "[T]he operations of drug dealers are generally an appropriate subject for expert testimony." "[B]ecause the clandestine nature of narcotics trafficking is likely to be outside the knowledge of the average layman, law enforcement officers may testify as experts in order to assist the jury in understanding these transactions."

*Nobles,* 69 F.3d at 183 (citations omitted).

■■■■■ Mr. Navarro does not challenge the qualifications of Agent Fanter as an expert in narcotics-related criminal cases. The DEA agent testified that, in his twenty-four years of narcotics investigation, he had specialized in undercover work and had conducted surveillance throughout the United States, Thailand, the Caribbean and Canada. Agent Fanter's experience, education and training certainly qualify him as an expert in narcotics transactions under Rule 702. *Id.* His

testimony did not address specifically Mr. Navarro's conduct. *See Hubbard,* 61 F.3d at 1275. Instead, his testimony concerning inositol and the use of plastic baggies and other drug paraphernalia "was designed to educate the jurors about drug transactions in general" and "in no way precluded the jury from arriving at an innocent explanation" of Mr. Navarro's activities. *United States v. Sanchez–Galvez,* 33 F.3d 829, 832 (7th Cir.1994). We consistently have approved such uses of expert testimony to explain the cocaine trade. *United States v. Romero,* 57 F.3d 565, 571 (7th Cir.1995) (citing cases). In this case, it is clear that the district court did not abuse its discretion in admitting this expert testimony on drug dealing, possession and distribution.

■■■■ However, Agent Fanter's comments concerning Hispanics require careful scrutiny. We turn first to the circumstances leading to the agent's remarks. The prosecutor asked the DEA agent whether it was common, in the large number of drug cases he had handled, actually to find drugs after someone has given his consent to search. Agent Fanter answered that it was common and had happened in his experience many times. When the prosecutor asked him to give his opinion why an individual would consent when he knew that the drugs were there, the district court overruled defense counsel's objection and allowed the opinion as "fair game given his expertise." R.94 at 197. Agent Fanter testified:

I find with Hispanics they'll grant permission more readily than most people. Especially ones that are from outside the United States. I think that's because of the way the police work in other countries. Other people think that you're going to go get a search warrant anyway and it's just going to prolong the matter and they'll give you permission. And some people refuse.

*Id.*[15]

Mr. Navarro objects to the admission of this remark. He asserts that the comment

---

15. The entire record of this discussion is offered below:

Q. Now, you've testified that you participated in a large number of drug investigations in your career. Have any of those investiga-

was based not on a statistical study but rather on a broadbased stereotypical conjecture from which the jury could conclude that Mr. Navarro consented, even though he knew the cocaine was in the truck, simply because he was Hispanic. The government responds that, because the issue at trial was whether Mr. Navarro knew that the cocaine was in his truck, it was appropriate to explain to the jury why Mr. Navarro consented to a search of his home and car and yet claimed at trial that he did not know that the cocaine was in his truck. The government insists that Agent Fanter was qualified to give such an opinion based on his many years of experience.

We question whether the government properly established that Agent Fanter was qualified to express an opinion that Hispanics would consent more readily than others. The qualifications he gave in court do not indicate that he has experience as an expert in hispanic or latino culture, or even with hispanic or latino drug dealers. No foundation was laid in this area; Agent Fanter did not report, for example, that he worked with Hispanics or Latinos, spoke Spanish, or conducted undercover investigations in Hispanic, South American, or North American latino communities. Law enforcement officers who testify as expert witnesses "from within the ranks of allies of the prosecution," as one member of the panel described them at oral argument, are powerful witnesses whose words carry much weight before a jury. It is therefore critical that the district courts use caution when scrutinizing their qualifications or when establishing the parameters of their testimony.

> The central danger seems to be that a jury may attach "undue weight" to the officer's testimony, either by mistaking an expert opinion for what is really only an eyewitness observation, or by inferring that the officer's "opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial."

*Lipscomb*, 14 F.3d at 1242 (citations omitted).

 In this case, however, even if Agent Fanter's testimony about Hispanics crossed into a realm beyond his expertise, it cannot justify the reversal of Mr. Navarro's conviction. To obtain a reversal simply of the admission of the challenged expert testimony, a defendant must show that the district court committed a clear abuse of discretion or, under Federal Rule of Evidence 403, that

tions involved individuals giving consent to search, first of all, a vehicle?

A. Of a vehicle, yes.

Q. A residence?

A. Yes.

Q. In your experience how common is it that you'll find contraband even when a defendant or an individual knows that it's in the place that he's consenting?

MR. GIESEN: Your Honor, I'm [sic] object to the relevance of other cases unrelated to this.

THE COURT: Well, I think it's a fair matter for his opinion. Overruled.

A. It's common to find paraphernalia, drugs, guns, after consent, money.

MS. LESLIE:

Q. How often would you say that's happened in your experience?

A. Many times. I don't know the percent but many times.

Q. Okay. Do you have an opinion about why this happens?

A. I have an opinion, yes.

MR. GIESEN: I'll object, again.

THE COURT: Overruled.

MR. GIESEN: The form of the question and the relevance.

THE COURT: His opinion as to why somebody might consent to a search under those circumstances, I think that's fair game given his expertise. Overruled.

A. Well, a lot of it has to do with the background of the individual you're asking permission from.

MS. LESLIE:

Q. What do you mean?

A. Found like with Hispanics, Hispanics always generally give you permission—

MR. GIESEN: I'll object—

A. Well—

MR. GIESEN: This is sure racist. It has nothing to do with Mr. Navarro. And I renew the objection to this sort of testimony.

THE COURT: Overruled.

A. I found with Hispanics they'll grant permission more readily than most people. Especially ones that are from outside of the United States. I think that's because of the way the police work in other countries. Other people think that you're going to go get a search warrant any way and it's just going to prolong the matter and they'll give you permission. And some people refuse.

R.94 at 196–97.

the probative value of that admitted testimony was substantially outweighed by the danger of unfair prejudice. *Romero*, 57 F.3d at 570; *Lipscomb*, 14 F.3d at 1242. Mr. Navarro does not even claim prejudice. This brief testimony, in the end, is of little significance. The agent's statement was offered at trial because Mr. Navarro had consented to the search of the truck and was claiming at trial that he knew nothing about cocaine in the truck. No reversible error was committed.

## C. Sentencing Issue: § 3B1.2—Minor Role in the Offense

■ Mr. Navarro requested that his sentence be reduced pursuant to U.S.S.G. § 3B1.2 because he was a minimal or minor participant in the conspiracy. That guideline provides:

**Sec. 3B1.2. Mitigating Role.**

Based on the defendant's role in the offense, decrease the offense level as follows:

(a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.

(b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B1.2.

The district court considered the request at length and denied the § 3B1.2 reduction specifically on the undisputed facts of the case, rather than on the confidential informant's information. Although it found strong circumstantial evidence that Mr. Navarro's farm was the source of the cocaine, it based its ruling on its finding that the three kilograms of cocaine were put in Mr. Navarro's truck at his farm and were transported thirty miles from the farm to Milwaukee: "[T]hat alone demonstrates that Mr. Navarro was not, the way the guidelines view it, a minimal or minor participant in this criminal activity." R.99 at 23.

Mr. Navarro contends that he was entitled to a reduction in his base offense level pursuant to U.S.S.G. § 3B1.2 because his own involvement in the conspiracy was very minor. He points out that there is no evidence that he profited from his relationship with Ruiz or was aware of any of Ruiz's activities with others in a broad cocaine distribution conspiracy. The only evidence concerning him, he submits, was the one trip to Milwaukee on November 3, 1994. Therefore he appeals the trial court's refusal to reduce his offense level. The government rejects Mr. Navarro's attempt to describe a widespread conspiracy, one that extends beyond himself and Ruiz to encompass other conspirators. It asserts that the court properly considered Mr. Navarro's integral role in *this* conspiracy, one involving only Navarro and Ruiz, and determined that, in this conspiracy, Mr. Navarro's role was equal or similar to Ruiz's role.

■ We review a sentencing court's decision whether to reduce an offense level for clear error. A defendant seeking a decrease in his offense level must prove that he was *substantially* less culpable than other co-conspirators. *Nobles*, 69 F.3d at 190.

When it appears that although one person was the "driving force" in a criminal scheme, yet the defendant still had "an integral role assisting him" in the enterprise, the defendant will not receive a reduction in his offense level pursuant to U.S.S.G. § 3B1.2(a).

*Id.* (citing *United States v. Bolin*, 35 F.3d 306, 310 (7th Cir.1994)). Such departures for a mitigating role in the offense are meant to be granted infrequently. U.S.S.G. § 3B1.2, comment. (n.2); *United States v. Brown*, 71 F.3d 1352, 1361 (7th Cir.1995).

The sentencing court made clear that the facts at trial established Mr. Navarro's integral role in assisting Ruiz: The court's finding that the cocaine was put in Mr. Navarro's truck at the farm and then taken from there to Milwaukee establishes his central role in the conspiracy and "rules out minor participant status" for him. *Id.* We certainly agree. Mr. Navarro was arrested with three kilos of cocaine in his truck, a baggie in his pocket and, he told the agents later, another baggie at his house. The larger conspiracy to which Mr. Navarro alluded was not charged in this

case, and no facts concerning other participants were developed at trial. The record fully supports the sentencing court's findings, and we find no clear error in the sentencing decision.

Conclusion

For the reasons presented above, we affirm the judgment of the district court.

AFFIRMED.