# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-3504

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ANDREW HUEBNER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01 CR 131—**Charles N. Clevert, Jr.**, *Judge.*

ARGUED FEBRUARY 25, 2003—DECIDED FEBRUARY 2, 2004

Before POSNER, COFFEY, and WILLIAMS, *Circuit Judges.*

COFFEY, *Circuit Judge.* On June 21, 2001, when defend-ant-appellant Andrew Huebner was arrested, agents of the Drug Enforcement Administration ("DEA") and officers of the Walworth County, Wisconsin, Drug Enforcement Unit found one kilogram of cocaine and $1,100 in United States currency in his vehicle. After searching his storage unit and his Lake Geneva, Wisconsin, residence, authorities confis-cated nearly six additional kilograms of cocaine as well as small quantities of psychlobin mushrooms and marijuana, $26,000 in currency, and three firearms. A federal grand

jury returned a three-count indictment charging Huebner with knowingly and intentionally possessing with the intent to distribute various quantities of a mixture containing cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), (B), and (C). In his defense, Huebner filed a motion to quash arrest and suppress evidence seized ("motion to suppress"), arguing that law enforcement officers stopped and searched his vehicle without probable cause, in violation of his Fourth Amendment rights. After evidentiary hearings before both the magistrate judge ("magistrate") and the district judge, the motion was ultimately denied. The defendant entered a conditional plea of guilty to knowingly and intentionally possessing with the intent to distribute a mixture containing cocaine in excess of 5 kilograms, reserving the right to appeal the denial of his motion to suppress. On appeal, Huebner argues that the court erred in concluding that his arrest was supported by probable cause. We affirm.

## I.  BACKGROUND

At about 11:00 p.m. on June 19, 2001, Chicago Police Officer Alonzo Harris pulled over Dario Cardella for driving "erratically." During the stop, Officer Harris observed in plain view a narcotic pipe and a subsequent search of the vehicle also revealed a small amount of cocaine. Harris placed Cardella under arrest and transported him to the police station. At the station, upon questioning, Cardella agreed to cooperate with the Chicago Police Department by acting as a confidential informant against his drug supplier, defendant-appellant Huebner.

Cardella was questioned by Detective Eddie Yoshimura, who had arrived at the scene of the arrest shortly after Cardella was pulled over. While Officer Harris took notes, the informant explained to the officers that Huebner was

his only source of cocaine. Cardella claimed that he had purchased multiple ounces of cocaine from the defendant nearly every week for roughly one year. The transactions took place near Huebner's Chicago condominium or, when the defendant was staying at his Lake Geneva, Wisconsin, residence, outside either a health club in Deerfield, Illinois, or the Brat Stop in Kenosha, Wisconsin. On at least one occasion, the exchange took place at Huebner's Lake Geneva home. During that transaction, the defendant borrowed Cardella's vehicle to procure the narcotics from another location and returned in a matter of minutes. This led the informant to believe that Huebner stored his cocaine near his Lake Geneva residence. Cardella further told the authorities that Huebner had recently acquired 20 kilograms of cocaine.

In addition to the tips furnished regarding Huebner's drug deals, Cardella offered the police a wealth of detailed background information about the defendant. He provided an accurate physical description of Huebner as well as the location and telephone number of the defendant's Chicago condominium. The police corroborated this information using records maintained by the Illinois Secretary of State. The informant also gave the officers directions to Huebner's Lake Geneva residence and his Chicago place of business, the Havana Art Gallery on Webster Avenue. Law enforcement officers independently verified the information about Huebner's business by contacting the Chicago Police Department's Licensing Bureau. Cardella's information was also consistent with tips from other confidential informants, who had previously disclosed to Detective Yoshimura that an owner of a Webster Avenue art gallery named "Andy" dealt cocaine. In regards to the defendant's vehicles, Cardella informed the officers that the defendant owned a 1997 four-door Lexus, which the authorities confirmed by searching Illinois vehicle registration records. Additionally,

the informant told Yoshimura that Huebner frequently conducted his narcotics deals while driving a black Jeep Cherokee.[1]

At 10:00 a.m on June 20, 2001, under the direction of Chicago law enforcement officers, Cardella placed a call from his cellular phone to Huebner's cellular phone to set up a "controlled buy" of one kilogram of cocaine. Huebner agreed and picked the Deerfield, Illinois, health club as the location of the transaction that was to take place later that afternoon. Chicago police officers, however, needed more time to prepare, so Cardella called Huebner a second time and cancelled the meeting.

In the meantime, the Chicago Police Department relayed the information provided by the informant to the DEA's office in Chicago. Shortly thereafter, the Chicago DEA's office contacted its counterparts in Madison and Milwaukee, Wisconsin. Madison DEA agents conducted their own investigation and discovered a phone listing for Louis Huebner, the defendant's father, registered to a Lake Geneva address. Madison agents then sought the aid of the Walworth County, Wisconsin, Sheriff's Department, and thus, a multi-jurisdictional task force was assembled to effectuate the arrest of Huebner.

---

[1] Officer Harris made no mention of the black Jeep Cherokee in his notes of the initial interview with Cardella, a fact that Huebner vigorously contends undermined Detective Yoshimura's credibility. In his recommendation on the motion to suppress, the magistrate rejected this attack on Yoshimura's credibility observing that "[Officer Harris's] notes are notes, rather than a verbatim rendition of the interview." (R. 41.) We find no error in the magistrate's characterization of the evidence, and we hasten to add that our perusal of the record reveals that Yoshimura was present during subsequent interviews of the informant conducted by Chicago DEA agents whereas Harris was not. Although the record is unclear, Yoshimura's knowledge of the black Jeep Cherokee may have come from one of these later interviews.

The next day, June 21, under the direction of Jeanne Hehr, Resident Agent in Charge, Madison DEA agents began surveillance of the defendant's Lake Geneva home. Early that morning, law enforcement officers observed a black Jeep Cherokee parked near the Lake Geneva residence, which the Illinois Department of Transportation confirmed was registered to Huebner. By 11:00 a.m., the task force had established both aerial and ground surveillance of Huebner's lake house.

Back in Chicago, members of the task force were taking steps to set up a controlled buy. At 11:30 a.m., the informant again contacted the defendant, at which time Huebner agreed to sell Cardella one kilogram of cocaine at the Brat Stop in Kenosha, Wisconsin, at 3:30 p.m. that afternoon. Detective Yoshimura and Officer Harris, along with other members of the task force, traveled with Cardella to the Kenosha Brat Stop to prepare for the transaction.

Meanwhile, events began to unfold at Lake Geneva. At approximately 2:47 p.m., task force members observed Huebner leave his Lake Geneva residence in the black Jeep Cherokee. Under constant aerial and ground surveillance, the defendant drove to a storage facility less than ten minutes from his lake house. Huebner opened one of the garage-type storage units, remained there for about five minutes, and then returned to his vehicle. As the defendant started to drive away, Agent Hehr ordered the task force to stop and arrest the defendant before he left the main drive of the storage facility. A search of Huebner's Jeep yielded a kilogram of cocaine and $1,100 in United States currency. Based on this information, search warrants for the storage unit and Huebner's Lake Geneva residence were obtained. Searches of those locations yielded almost six additional kilograms of cocaine, small quantities of marijuana and psychlobin mushrooms, three firearms, and $26,000 in cash.

Five days later, a federal grand jury returned a three-count indictment against Huebner for possessing with the intent to distribute various quantities of a mixture containing cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), (B), and (C). In his defense, Huebner subsequently filed a motion to suppress, arguing that the police did not have probable cause to effectuate a warrantless stop, arrest, and search of his person and vehicle. The magistrate held an evidentiary hearing on the motion during which Detective Yoshimura, Officer Harris, and Agent Hehr testified. Cardella, the informant, did not testify.

The witnesses testified to the above sequence of events, but there were numerous discrepancies in their testimony, which Huebner contends undermined their credibility. For example, Huebner calls attention to the fact that Yoshimura testified that Cardella went home after his initial interview on the night of June 19 and returned to the police station the next morning to set up the controlled buy. Harris gave contravening testimony that the informant remained in custody from the time of his arrest until he was driven home on the afternoon of June 20.

Huebner also points out that Officer Harris testified that he joined Detective Yoshimura and Cardella on a driving excursion in a covert police van on the afternoon of June 20, at which time the informant directed the officers to the defendant's residence and his place of business. However, Detective Yoshimura made no mention of this driving excursion. He instead testified that the informant remained at the police station from 10:00 a.m. until 4:00 or 5:00 p.m. on June 20.

Huebner further maintains that the officers' testimony—that Cardella used his cellular phone to contact the defendant via the latter's cellular phone to set up the controlled buy—was incredible because no witness could

testify to the number the informant called, nor was it ever recorded or cross-referenced for accuracy. Detective Yoshimura testified that Cardella's cellular phone, in which Huebner's numbers were allegedly stored, was inventoried. However, Officer Harris disagreed with Yoshimura on this point, and the phone was never introduced into evidence.

In his recommendation to the district court, the magistrate voiced concern for these inconsistencies, stating that "there is much to be desired in Yoshimura's and Harris's recollection of events." (R. 41.) Nevertheless, the magistrate concluded that the "prediction of specific future activities constituting a drug deal in the making by a known, rather than anonymous informant, coupled with corroborated historical information regarding the art gallery and residence locations [was] sufficient to establish probable cause." *Id.*

Before ruling on the motion, the district judge conducted an additional evidentiary hearing during which only Detective Yoshimura and his partner, Detective Rick Maher, testified. At this second hearing, Yoshimura acknowledged mistakes in his prior testimony. He stated that Cardella had remained in police custody overnight on June 19, 2001, and that the informant's cellular phone was never inventoried. Instead, the detective testified that the phone was merely placed into an inventory bag on June 19 and returned to Cardella the next day so that he could set up the controlled buy with Huebner. Yoshimura also agreed that the informant had directed Officer Harris, Detective Maher, and himself to Huebner's Chicago condominium during a driving excursion on the afternoon of June 20. Detective Maher generally endorsed Yoshimura's account of the events preceding the defendant's arrest, although, as Huebner is quick to point out, he did testify that he believed *Yoshimura* verified the informant's data, while Yoshimura testified that Officer Harris confirmed the information furnished by Cardella.

At the conclusion of the hearing, the district court found the officers' testimony to be credible, and further concluded that the "quantum of information available to [the arresting officers] constituted probable cause to effectuate a warrantless stop and search." (R. 49.) Accordingly, the defendant's motion was denied.

Huebner entered a conditional plea of guilty to one count of the indictment—knowingly and intentionally possessing with the intent to distribute a mixture containing cocaine in excess of 5 kilograms—reserving his right to appeal the denial of his motion to suppress. The court dismissed the remaining counts and sentenced Huebner to 120 months in prison and assessed a fine of $100,000.

## II.  ISSUES

On appeal, Huebner makes two arguments dealing with the denial of his motion to suppress. Initially, he claims that the testimony at the suppression hearings was inadequate to support a finding of probable cause. Huebner also argues that, considering the totality of the circumstances, the police lacked probable cause to effectuate his arrest and search. We address each of these arguments in turn.

## III.  ANALYSIS

### A. Credibility

Huebner asserts that the lower court improperly relied on incredible testimony of the government's witnesses in order to find probable cause. He points to the inconsistencies in the officers' account of events leading up to his arrest to support his assertion, including Harris's and Yoshimura's discrepant testimony before the magistrate regarding Cardella's location on June 20, as well as Yoshimura's and

Maher's conflicting testimony presented to the district judge concerning which officer confirmed the information provided by Cardella. Huebner further argues that the officers' credibility was undermined by the fact that none of them could recall the phone number the informant called to set up the controlled buy, nor was that number ever recorded or independently verified as belonging to the defendant. The district court found the officers' testimony to be credible and concluded that the inconsistencies in their testimony were immaterial to the issue of whether there was probable cause to stop, arrest, and search the defendant and his vehicle.

We review for clear error a trial judge's credibility determination based upon testimony presented during a suppression hearing. *United States v. Koerth*, 312 F.3d 862, 865 (7th Cir. 2002). Under the clear error standard of review, "a district judge's credibility determination will not be disturbed unless it is completely without foundation." *United States v. Salyers*, 160 F.3d 1152, 1162 (7th Cir. 1998). We afford this deference to the trial judge insofar as he "has the best 'opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements,' as well as confused or nervous speech patterns *in contrast with merely looking at the cold pages of an appellate record.*" *United States v. Tolson*, 988 F.2d 1494, 1497 (7th Cir. 1993) (quoting *Churchill v. Waters*, 977 F.2d 1114, 1124 (7th Cir. 1992)); *accord United States v. Quintanilla*, 218 F.3d 674, 678 (7th Cir. 2000).

After reviewing the record, we refuse to disturb the district court's decision to deny the motion to suppress because there were myriad reasons to accept the officers' testimony as credible, including their consistent testimony regarding the following: the drug transaction set to occur at

the Brat Stop; the confidential informant's prediction of Huebner's activities on the day of his arrest; and the independently corroborated background information furnished by Cardella. Moreover, although the defendant nit-picks the record and points out minor inconsistencies amidst the officers' otherwise consistent testimony, we have previously warned litigants challenging credibility determinations that "[t]estimony is not incredible as a matter of law . . . only because the witness may have been impeached by certain discrepancies in his story, by prior inconsistent statements, or by the existence of a motive to provide evidence favorable to the government." *United States v. Scott*, 145 F.3d 878, 883 (7th Cir. 1998) (internal quotations omitted). Rather, this Court must accept testimony deemed credible " 'unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it.' " *United States v. Mancillas*, 183 F.3d 682, 710 (7th Cir. 1999) (quoting *United States v. Yusuff*, 96 F.3d 982, 986 (7th Cir. 1996)). Thus, particularly in light of the overwhelming evidence discussed *infra* that Huebner was engaged in illicit activity, we refuse to second guess the lower court's credibility determination and we are confident that the court's credibility judgment was not clearly erroneous.

## B. Probable Cause

Huebner next argues that law enforcement officers lacked probable cause to arrest and search him and his vehicle. This Court "review[s] the probable cause determination involved in the district court's denial of [Huebner's] motion to suppress de novo." *United States v. Mounts*, 248 F.3d 712, 714-15 (7th Cir. 2001). In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court held that the task of determining the existence of probable cause "is simply to make a

practical, common-sense decision whether, given all of the circumstances set forth . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."[2] *Id.* at 238; *accord Driebel v. City of Milwaukee*, 298 F.3d 622, 643 (7th Cir. 2002).

In *Gates*, the Supreme Court held that a highly detailed tip from an anonymous informant that was corroborated by independent police work established probable cause. 462 U.S. at 246; *see also Alabama v. White*, 496 U.S. 325, 329 (1990) (stating that if "an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity"). In *White*, the Court then set forth the proper approach for analyzing whether an informant's tip establishes probable cause: "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." 496 U.S. at 330-31. Thus, a court must "consider the informant's information—in amount and in degree of reliability—and the degree of corroboration of that information by the officers." *United States v. Navarro*, 90 F.3d 1245, 1253 (7th Cir. 1996); *see also United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir. 1995) (stating that "[r]eliability may be shown by the informant's past record of reliability, [and/or] through independent confirmation or personal observation by the police"). With these principles in mind, we analyze the information possessed by members of the task force when they stopped and searched Huebner's black Jeep Cherokee.

---

[2] The defendant does not dispute the well-established rule that a warrantless search of an automobile is permissible under the Fourth Amendment when a law enforcement officer has "probable cause for believing that the automobile which he stops and seizes [contains] contraband." *Carroll v. United States*, 267 U.S. 132, 156 (1925).

On three consecutive days, Cardella, the confidential informant, met with police officers concerning Huebner's illicit activities. On June 19, Cardella provided Chicago police officers—during a live, in-person interview—with detailed information pertaining to his previous drug transactions with the defendant. During the same interview, the informant further revealed that Huebner had recently received 20 kilograms of cocaine. On June 20, he directed the officers to Huebner's Chicago condominium and place of business. And on June 21, Cardella set up the controlled buy that resulted in Huebner's arrest.

Furthermore, the informant provided the authorities with detailed background information concerning the defendant—including Huebner's name and physical description; the location of his Chicago condominium, Lake Geneva residence, and Chicago place of business; and a description of his vehicles—which police officers extensively corroborated through independent investigation. The information Cardella furnished was consistent with tips from other confidential informants, who had previously disclosed to Chicago police officers that an owner of a Webster Avenue art gallery named "Andy" dealt cocaine. The informant also knew that Huebner would be at his Lake Geneva house on the day of his arrest and he further predicted the locations at which Huebner would agree to conduct the drug transactions, including the Deerfield, Illinois, health club and the Kenosha, Wisconsin, Brat Stop.

Additionally, prior to arresting Huebner, the agents conducted surveillance of the defendant that, when considered in conjunction with the information the officers had received from Cardella, was clearly sufficient to warrant a law enforcement officer of "reasonable prudence" to believe that Huebner was engaged in illicit, drug dealing activity. *See Ornelas v. United States*, 517 U.S. 690, 696 (1996); *United States v. DeBerry*, 76 F.3d 884, 886 (7th Cir. 1996).

Consistent with the informant's predictions, on the day of the controlled buy, agents observed Huebner leaving his residence and stopping at another location very close to his home. Insofar as Huebner's actions mirrored Cardella's prediction of this event, it became clear that Cardella indeed possessed "inside information," further establishing his reliability. *See Navarro*, 90 F.3d at 1253. Officers next observed the defendant at the storage facility for five minutes.[3] In light of Cardella's tip that Huebner stored cocaine near his Lake Geneva residence, this "seemingly innocent activity" was properly deemed suspicious by the observing officers. *See Gates*, 462 U.S. at 243 n.13 ("[T]he relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts."); *United States v. McClinton*, 135 F.3d 1178, 1184 (7th Cir. 1998); *Navarro*, 90 F.3d at 1253.

At 3:00 p.m., officers witnessed the defendant as he began to drive out of the storage facility. The Brat Stop was about 30 minutes away and the controlled buy was scheduled for 3:30 p.m. Thus, Huebner was on schedule to arrive at the controlled buy at the appointed time. When considered along with the totality of the circumstances known to the task force at the time, Huebner's activities that afternoon

---

[3] Although the task force did not observe Huebner place narcotics in his Jeep Cherokee, we stated in *Navarro* that this was of no consequence: "The fact that agents did not see the cocaine placed in the [vehicle] does not diminish the significance of the [confidential informant's] detailed information . . . . When we consider the detail of the [confidential informant's information] in the 'totality of the circumstances,' taking into account the informant's veracity, reliability, and basis of knowledge, we readily conclude that the informant proved himself to be reliable about the facts that were corroborated and 'more probably right about other facts.' " 90 F.3d at 1253 (quoting *Gates*, 462 U.S. at 244).

"warrant[ed] a well-trained law enforcement officer, exercising reasonable judgment, to believe that a narcotics crime was being [or was about to be] committed." *United States v. Marin*, 761 F.2d 426, 432 (7th Cir. 1985).

Nevertheless, Huebner claims that the informant's prediction of his future activities lacked the necessary detail, precision, or corroboration by law enforcement officers to constitute probable cause. Huebner's argument, however, fails in light of this Court's ruling in *Navarro*. In *Navarro*, we applied Fourth Amendment principles to facts similar to the facts in the instant case and held that probable cause existed to stop the defendant's vehicle based on information, received from a confidential informant, that law enforcement officers had corroborated by observing the defendant's activities. *Navarro*, 90 F.3d at 1254-55. In that case, the known confidential informant predicted that Navarro's co-defendant would leave his home in Waukegan, Illinois, and drive to Navarro's farm in Kenosha County, Wisconsin, to retrieve cocaine before continuing on to Milwaukee. *Id.* at 1249. The informant identified the co-defendant's residence and Navarro's farm. Two other informants provided corroborating information about the co-defendant's drug dealing activities. Shortly after the informant informed DEA agents that the defendants would soon be involved in a narcotics transaction, agents observed the co-defendant driving from his home to Navarro's farm, and then stopping at Navarro's farm before continuing on, with Navarro, toward Milwaukee. The agents stopped the defendants' vehicle as it neared Milwaukee and a subsequent search of the vehicle yielded three kilograms of cocaine.

Prior to trial, Navarro moved to suppress the evidence from the stop and search, arguing that the authorities had acted without probable cause to believe that the vehicle contained contraband, but there, as here, the district court adopted the magistrate's recommendation to deny the

motion. On appeal, we affirmed, holding that "the [informant's] highly detailed tip, highly reliable in its own right and thoroughly verified by independent police work, provided probable cause for the police to stop the vehicle and to search it for contraband." *Id.* at 1254.

Huebner attempts to distinguish the instant case from *Navarro* arguing that probable cause existed in *Navarro* only because (1) the informant had assisted the police in other cases; (2) the informant knew the location where the cocaine was stored; and (3) the defendant was driving towards Milwaukee, as the informant had predicted, at the time his vehicle was stopped and searched. In contrast, Huebner points out that Cardella was a first-time informant who did not know precisely where the defendant stored his cocaine. In addition, the defendant argues that the task force did not corroborate the informant's prediction that Huebner was on his way to conduct a drug sale at the Brat Stop because the authorities stopped Huebner before he left the main drive of the mini-storage warehouse.

We are unconvinced. Aside from failing to pay heed to the Supreme Court's repeated warnings that probable cause is not a "finely tuned standard," *Gates*, 462 U.S. at 235, but rather a "fluid concept" that takes its "substantive content from the particular context[ ] in which [it is] being assessed," *Ornelas*, 517 U.S. at 696, the defendant also ignores that in the present case, just as in *Navarro*,the informant's reliability was clearly demonstrated through the highly detailed and extensively corroborated (by police investigation and other informants) information he provided to the authorities, such as his prediction of Huebner's actions prior to the arrest and his description of the defendant's homes, business, and vehicles. Thus, Cardella's allegation, that Huebner dealt illicit drugs, was reasonably trustworthy. *See United States v. Ganser*, 315 F.3d 839, 843 (7th Cir. 2003) ("If an informant is shown to be right about some things, he is probably right about other

facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity." (internal quotations omitted)). Like *Navarro*, the trustworthy information in the instant case was "sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Gilbert*, 45 F.3d at 1166 (internal quotations omitted); *see also Wollin v. Gondert*, 192 F.3d 616, 622 (7th Cir. 1999); *Navarro*, 90 F.3d at 1254 ("[B]ecause the surveillance preceding the stop corroborated the information from the informant, the law enforcement officers had probable cause for both arrest and search.").

Given the highly detailed and thoroughly corroborated information pertaining to Huebner's illicit drug dealing activities that law enforcement officers acquired from Cardella—a known, confidential informant—the task force reasonably concluded that there was a "fair probability" that narcotics would be found in the defendant's Jeep Cherokee at the time he was stopped. *See Gates*, 462 U.S. at 238; *United States v. Rosario*, 234 F.3d 347, 350-51 (7th Cir. 2000). Accordingly, we hold that the arresting officers possessed probable cause to stop, arrest, and search the defendant and his vehicle.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*