In the

# United States Court of Appeals
## For the Seventh Circuit

No. 08-3411

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RONALD Q. TERRY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05 CR 146—**Charles N. Clevert, Jr.**, *Judge.*

ARGUED MARCH 30, 2009—DECIDED JULY 16, 2009

Before KANNE, WOOD, and WILLIAMS, *Circuit Judges.*

KANNE, *Circuit Judge.* In October 2007, the defendant, Ronald Terry, pled guilty to conspiring to distribute controlled substances and was sentenced to more than twenty years in prison. In his plea agreement, Terry reserved the right to appeal adverse decisions on his pretrial motions, which included the denial of a motion to suppress evidence. Terry appeals that ruling, and we now affirm.

## I. BACKGROUND

The government began investigating the drug trafficking activities of Mark Cubie, one of Terry's co-defendants, in late 2004. As part of the investigation, authorities monitored Cubie's telephone communications using "pen registers" and "trap and trace devices." A pen register records the telephone numbers of outgoing calls made from the monitored phone, while a trap and trace device records the telephone numbers of those calling the phone. Neither method records conversations; both compile only numerical data.

In early April 2005, investigators noted a significant change in calling patterns on Cubie's telephone, which was registered with a number ending in 1716. This change indicated that the phone was no longer in Cubie's possession. The government subsequently identified Cubie's new telephone, which ended in 5638. As we discuss below in the context of Terry's suppression hearing, the way in which this identification occurred is at the center of the present dispute.

On April 12, 2005, authorities requested authorization to monitor 5638 with a pen register and a trap and trace device. On the same day, acting pursuant to 18 U.S.C. § 2703(d), they also obtained 5638's past phone records. Using data gathered from these sources, investigators later received permission to place Title III wiretaps on the telephones of Cubie and Orlandes Nicksion, another of Terry's co-defendants. Evidence compiled from these wiretapped conversations ultimately led to Terry's indictment.

On September 18, 2007, a federal grand jury in the Eastern District of Wisconsin returned a third super-seding indictment against six men, including Terry, Cubie, and Nicksion.[1] Three of the indictment's nine counts, all involving various drug and related firearm offenses, named Terry as a defendant.

Terry filed a motion to suppress on October 20, 2006. Terry presented two arguments: first, that law enforce-ment illegally obtained information that it then used to identify and monitor Cubie's 5638 telephone, thereby tainting any evidence derived therefrom, *see* 18 U.S.C. §§ 2515, 2518; and second, that the government know-ingly failed to disclose the illegality of these intercepts, in violation of *Franks v. Delaware*, 438 U.S. 154 (1978).[2] Both claims hinge on the legality of the government's investigation into Cubie's new telephone number.

---

[1] The grand jury returned its first indictment on June 7, 2005. With the exception of a firearms charge that was later dropped, the original indictment alleged essentially the same charges against Terry as the third superseding indictment. A super-seding indictment issued on July 19, 2005, followed by a second superseding indictment on August 22, 2006; neither superseding indictment contained any material changes related to Terry.

[2] Terry's standing to challenge the wiretap evidence is pro-vided by statute and is not disputed by the government. *See* 18 U.S.C. §§ 2510(11), 2518(10)(a). The statute provides that any "aggrieved person," defined as one "against whom the interception was directed," *id.* § 2510(11), may move to sup-press wiretap evidence on grounds that it was unlawfully intercepted, *id.* § 2518(10)(a).

A federal magistrate judge held two hearings on Terry's motion. At the first, held December 6, 2006, the government presented a single witness, Dan Thompson, a detective with the Milwaukee Police Department. Detective Thompson detailed the process he followed to obtain court orders for the pen register, trap and trace device, and § 2703(d) report on 5638. He then discussed using the information gleaned from these sources to acquire authorization for the Title III wiretap on that same phone. According to Thompson, the government used two primary clues to identify 5638: (1) a confidential informant's call to 1716; and (2) a comparison of 1716's old calling patterns with the past and current calling patterns of phones associated with Nicksion and Terry.

First, Thompson stated that on April 4, a confidential informant, acting at the behest of investigators, telephoned 1716 and asked to speak with Cubie. A female answered the call and told the informant that the phone was no longer Cubie's. According to Thompson, 1716's pen register indicated an outgoing call to 5638 "[a] couple of hours after [the confidential informant's call]." The timing of this call from 1716 to 5638 was later questioned during the second suppression hearing.

Second, Thompson testified that he had analyzed call information taken from preexisting pen registers and trap and trace devices on phones belonging to Nicksion and Terry. Thompson stated that Nicksion and Terry were placing calls to and receiving calls from 5638 in frequencies that were similar to their previous calling patterns with 1716, while calls to and from 1716 had stopped altogether.

In his motion and at the hearing, Terry sought to discredit Thompson. Terry targeted one attack at a supplemental report, prepared by Thompson, that documented the calling patterns of Cubie's new 5638 number. Thompson's report contained two date/time stamps. The first stamp, which appears on the report's first page, was entered manually by the person creating the report. The second stamp, located on the report's second page, was automatically generated by the computer program. The manually entered date/time stamp was April 11 at 4:00 p.m. The automatically generated stamp was a day later, on April 12 at 3:18 p.m.

From this evidence, it was not immediately clear whether the report was created on April 11 or April 12, a fact that Terry argued was of significance. According to Terry, if Thompson created the report on April 11, it would support Terry's contention that the government actually possessed 5638's call data *before* receiving judicial approval to obtain such data on April 12. At the hearing, Thompson explained the discrepancy as an inadvertent mistake—he had simply erred and entered the incorrect date.

On cross-examination, Terry also probed Thompson's statements about the use of data collected from Terry's telephone to help identify 5638. According to Terry, authorities did not receive permission to monitor his phone until May 2005, several weeks after the April 12 court authorization for 5638. Thompson, however, stood firm in his claim that authorities were legally monitoring Terry's call data prior to April 12 and that he had used

such data to identify 5638. At the conclusion of the hearing, Terry's counsel requested documentation proving that the government was lawfully monitoring Terry's telephone before April 12.

The government, however, was unable to provide such proof. Indeed, it discovered that it had not been monitoring Terry's phone at that time. Immediately following the first hearing, the government filed a motion to reopen, accompanied by an affidavit from Detective Thompson confessing errors of fact in his testimony. According to Thompson, he testified mistakenly that he had relied on pen/trap data gathered from Terry's phone to identify 5638 as Cubie's new telephone number. After the hearing, Thompson learned that no orders authorizing the collection of such data from Terry's two telephones were issued until May 3, 2005, meaning that he could not possibly have used Terry's phone data to identify Cubie's new number the month before. In his affidavit, Thompson reaffirmed the remainder of his testimony from the first hearing, particularly those statements related to the confidential informant's telephone call to 1716 and the monitoring of Nicksion's phone activities. It was this information, Thompson stated, that allowed him to connect 5638 with Cubie.

The court granted the motion to reopen and held a second hearing on Terry's motion to suppress on December 20, 2006. Thompson testified again, explaining his mistake during the previous hearing. An additional discrepancy emerged at the second hearing regarding the timing of the phone call from 1716 to 5638. At the

first hearing, Thompson testified that 1716 had called 5638 *after* receiving the informant's call on April 5. Phone data, however, revealed that 1716's new user had called 5638 on March 31, six days *before* the April 5 phone call from the confidential informant. Thompson explained that he had again been mistaken—that he had *learned* of the call between 1716 and 5638 after the informant's call to 1716, not that the call had actually occurred subsequent to the informant's call.

Thompson's reliance on Nicksion's phone data remained unchanged. In early April, Nicksion had stopped communicating with 1716 and begun calling 5638 at a frequency similar to his previous calls to 1716. Near the conclusion of his testimony, Thompson said: "Right now I'd have to say Orlandes Nicksion's pen was the key to us identifying that phone number . . . ."

As Terry pointed out, Thompson's new focus on Nicksion's number alone contradicted a statement the government made in its § 2703(d) application, filed on April 12. There, as one of its grounds for issuing the § 2703(d) order, the government offered "[a]n analysis of the telephone records pertaining to the most commonly called *numbers* to [1716] over a two month period" (emphasis added). If, as Thompson contends, he had relied on analysis of only Nicksion's number, the use of the plural "numbers" in the § 2703(d) application would be at odds with Thompson's testimony.

In his recommendation to the district judge, the magistrate judge found that Thompson's original misstatements were mistakes made in good faith—not, as Terry asserted, evidence of governmental indiscretion. The magistrate

judge determined that Thompson's testimony, including his explanations for the aforementioned discrepancies, was credible and recommended to the district court that it deny Terry's motion to suppress. The district judge adopted the recommendation in an order dated August 21, 2007.

Terry eventually pled guilty to the charge contained in Count One—conspiring to distribute more than five kilograms of cocaine, fifty grams of crack, and an unspecified quantity of marijuana in violation of 21 U.S.C. § 841(a)(1)—and was sentenced to 260 months in prison, to be followed by five years of supervised release. In exchange for his plea, the government dismissed the remaining two counts against Terry. It also allowed him to reserve the right to appeal issues raised in any pretrial motions, which included his motion to suppress. Terry now appeals the district court's decision on this motion.

## II. ANALYSIS

In essence, Terry asks us to overturn the finding that Detective Thompson was a credible witness. To convince us to take such a drastic step, Terry must traverse a difficult path.

When a credibility finding is based upon testimony presented during a suppression hearing, we will reverse such a determination only when it is clearly erroneous. *United States v. Huebner*, 356 F.3d 807, 812 (7th Cir. 2004). Indeed, we provide "special deference" to credibility

findings, based on the lower court's superior position to evaluate a witness. *United States v. Whited*, 539 F.3d 693, 697 (7th Cir. 2008); *see also Huebner*, 356 F.3d at 812 (commenting on the trial judge's ability "to observe the verbal and nonverbal behavior of the witnesses . . . in contrast with merely looking at the cold pages of an appellate record" (emphasis and quotations omitted)); *United States v. Mancillas*, 183 F.3d 682, 710 (7th Cir. 1999) ("[W]e do not second-guess the . . . judge's credibility determinations because he or she has had the best opportunity to observe . . . the subject's . . . facial expressions, attitudes, tone of voice, eye contact, posture and body movements . . . ." (alterations in original) (quotations omitted)). We will credit testimony found credible by the court below "'unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it.'" *Mancillas*, 183 F.3d at 710 (quoting *United States v. Yusuff*, 96 F.3d 982, 986 (7th Cir. 1996)).

As both the magistrate judge and the district judge acknowledged, there were a number of discrepancies surrounding Detective Thompson's testimony and the documentary evidence presented in support thereof. First, there was the misdated report, which, if it had been created on the date entered by Thompson, would suggest that Thompson had early access to unauthorized information; this error Thompson chalked up as "a typo." Second, he said that the new user of 1716 placed a call to 5638 within a "couple of hours" of receiving a call from a government informant; when confronted with

the phone records, however, he admitted that 1716 had telephoned 5638 several days before the informant's call. Third, Thompson originally stated that Terry's phone data provided a link between 5638 and Cubie, only to recant the statement after he realized that the government did not begin monitoring Terry's phone until three weeks after it identified the 5638 number. And fourth, we learned of the § 2703(d) application, which discussed the analysis of data gleaned from the phones associated with 1716's "frequently called numbers," although Thompson eventually testified that he relied on the calling pattern of only one number, Nicksion's, to identify 5638.

These facts are indicative of less-than-exemplary detective work and are certainly unfavorable to the government. Detective Thompson's missteps in his written documentation and testimony were far cries from the accuracy that we expect from those empowered with restricting the freedom of our citizens. Before a person is sent to prison for any length of time, let alone twenty years of his life, he is correct to demand accountability from those who are responsible for sending him there. As we know, however, perfection is impossible. So although Thompson's several mistakes might be regrettable, they were, as the magistrate and district judges rightfully concluded, nothing more than mistakes.

As we have said: "'[T]estimony is not incredible as a matter of law . . . only because the witness may have been impeached by certain discrepancies in his story, by prior inconsistent statements, or by the existence of a

motive to provide evidence favorable to the government.'" *Huebner*, 356 F.3d at 813 (second alteration in original) (quoting *United States v. Scott*, 145 F.3d 878, 883 (7th Cir. 1998)). Each of these circumstances existed, to one degree or another, in this case. Yet after a thorough review of the relevant facts, the magistrate judge found Terry's arguments unavailing. The facts were only that the government had committed a series of minor errors, not that it had acted illegally.

Staring at the pages of a cold record, we are in no position to reassess the credibility of the sole witness who appeared at the suppression hearing. That job belonged to the magistrate judge. The district judge properly deferred to his judgment; we, in turn, will defer to them both. This is not, as Terry contends, a "remarkable case" warranting reversal. There is nothing in the record that compels the conclusion that the government acted illegally in identifying Cubie's 5638 number. The district court's decision was not clearly erroneous and must stand.

## III. Conclusion

We AFFIRM the decision of the district court to deny Terry's motion to suppress.