In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1398

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JASON T. PROCKNOW,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:13-cr-00053-wmc-1 — **William M. Conley**, *Chief Judge.*

ARGUED FEBRUARY 20, 2015 — DECIDED APRIL 27, 2015

Before RIPPLE, KANNE, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Defendant-Appellant Jason Procknow pleaded guilty to one count of theft of government money, 18 U.S.C. § 641, and one count of aggravated identify theft, *id*. § 1028(a)(1), related to his filing of fraudulent tax returns claiming refunds. Procknow appeals the denial of his motion to suppress, having reserved the right to do so in his plea agreement. Procknow moved to suppress (1) evidence obtained after police officers' warrantless entry into his hotel

room following his arrest in the hotel lobby, and (2) evidence obtained by grand jury subpoena following the withdrawal of Internal Revenue Service ("IRS") administrative summonses requesting the same information. We affirm.

## I.    BACKGROUND

In connection with Procknow's motion to suppress, a magistrate judge conducted an evidentiary hearing, which included the live testimony of seven witnesses, and recommended factual findings. After receiving objections from both sides, the district court adopted the majority of the magistrate's recommended findings. Unless noted, the facts set out below are derived from those adopted by the district court.

On August 29, 2011, at about 5:45 p.m., a Wisconsin probation officer phoned the Eagan, Minnesota, Police Department ("EPD") requesting assistance in apprehending Procknow, who had absconded approximately four months earlier while serving a term of supervised release imposed by a Wisconsin state court. Wisconsin authorities had received information that Procknow and his girlfriend, Jennifer Van Krevelen, might be staying at the Extended Stay America hotel in Eagan. The EPD received Procknow's photograph, a description of his car, information about Procknow's criminal history—including a conviction for attempted murder—and a warning that there was a high risk Procknow would run from the police.

Shortly after receiving the probation officer's phone call, a squad of EPD officers traveled to the hotel and asked the front-desk clerk, Christopher Schuelke, if Procknow was staying at the hotel. Schuelke could not locate Procknow's

name in the registry because Procknow—in violation of Minnesota law and hotel policy—failed to register at the time of check-in. The officers asked about Van Krevelen, and Schuelke responded that she was registered and staying in room 315. Three officers went to room 315, where they saw a magnetic sign on the door frame announcing, "PET INSIDE." The officers knocked on the door and received no response, although they heard someone or something moving inside the room. Based upon the sign on the door, the officers assumed a dog was in the room making the noise they heard.

The officers exited the hotel and returned to their cars. Some of the officers had driven away when one of the officers radioed that he thought he had just seen Procknow's car pull into the hotel lot. By the time all of the officers returned, the EPD had run the Wisconsin license plate of the car and confirmed that the car was registered to Procknow. Two officers approached Procknow's car and found Van Krevelen standing alone.

Another officer, Matt Ondrey, approached the hotel's double entrance doors. As Ondrey opened the outer door, he came face-to-face with Procknow. Ondrey asked Procknow to come outside. Procknow instead wheeled and ran through the hotel lobby; Ondrey pursued, ordering him to stop. As Procknow neared an interior door, Ondrey fired his taser, causing Procknow to lurch into the door and tumble onto the ground. By the time Procknow had been handcuffed and placed in a sitting position in the hotel lobby by Ondrey and two other officers, Procknow had been tased three times,

was bleeding from facial cuts, and had some newly-broken teeth.[1] In a search incident to arrest, the officers obtained from Procknow a credit card in the name of "Trevor Coon." Paramedics were called, and they took Procknow to the hospital, accompanied by Ondrey. The officers also arrested Van Krevelen for harboring a fugitive.

EPD officer John Collins and two other officers remained at the hotel. Collins looked through the windows of Procknow's car and saw a scanner or copier. He reviewed the Wisconsin warrant and saw that Procknow's conviction underlying the supervised-release violation involved forgery. Collins returned to the front desk, informed Schuelke that both of the known occupants of room 315 had been arrested, and asked Schuelke if hotel management wanted police assistance. Collins, then a 12-year veteran of the EPD, knew the hotel manager, Adam Scheler, and knew that hotel management had asked the EPD to help eject any remaining occupants in prior incidents at the hotel that resulted in arrests. Schuelke phoned Scheler repeatedly for instructions. Scheler told Schuelke that Van Krevelen and Procknow were no longer welcome at the hotel, and their stay was being terminated. Scheler instructed Schuelke to pass this information onto the EPD officers and ask the officers to collect the dog

---

[1] Procknow filed a civil suit against the arresting officers in federal court in Minnesota, alleging, *inter alia*, claims of excessive force. Among the allegations levied by Procknow was that, during the course of the arrest, one of the officers "dropped his knee onto the back of Procknow's head," and said to Procknow—who was wearing a Green Bay Packers shirt— "Welcome to Minnesota Vikings territory." *Procknow v. Curry*, 26 F. Supp. 3d 875, 879 (D. Minn. 2014). On March 3, 2015, a jury returned a verdict in favor of the officers.

believed to be in room 315 and ensure that there were no other occupants in the room. (It is EPD policy for officers to secure abandoned dogs and take them to Eagan's animal control center.)

Collins and the other two EPD officers re-approached room 315, knocked, and announced their presence. The officers were armed with an animal catch pole (a four-foot pole with a steel noose at the end) and a carbine rifle, because they had been told (apparently by Van Krevelen) that the dog's name was "Spike," which led them to presume that the dog might be "some type of … pitbull or larger, somewhat ferocious dog."[2] No one answered the door, so the officers used a hotel key card to enter the room. The officers did not see any people, but they saw Spike—who turned out to be a young, Labrador Retriever mix—walking freely about the room. As one might expect from a dog comprised in large part of Labrador, Spike had a friendly and docile temperament. *See* Am. Kennel Club, The Labrador Retriever, *available at* http://www.akc.org/dog-breeds/labrador-retriever/ (last visited Apr. 10, 2015). Despite one officer's confession to being "not a huge fan of dogs," Spike's amiable demeanor won over the officers, which resulted in abandonment of their plan to use the animal catch pole.

The officers entered the room and walked to the windows to ensure that there were no other occupants. In plain

---

[2] Perhaps the officers were thinking of "Spike," the fierce bulldog antagonist from the *Tom and Jerry* television series. *See* Spike Bulldog, Tom and Jerry Wikia, *available at* http://tomandjerry.wikia.com/wiki/Spike_Bulldog (last visited Apr. 10, 2015).

view, the officers saw an electric typewriter, "paperwork all over the place," and a credit card issued in the name of "Smith." The visible paperwork included financial forms bearing a variety of names, dates of birth, and social security numbers. One officer photographed the room, while another found Spike's leash. Taking only Spike and the leash, the officers left the room and sealed it. The officers took Spike to the city kennel, then applied for and received search warrants for the hotel room and Procknow's car.

In October 2011, an EPD detective met with IRS special agent Steven Kuntsman, and turned over to Kuntsman all of the documents and other evidence seized pursuant to the search warrants. Among the documents and evidence seized were blank IRS W-2 forms, blank and partially completed IRS tax forms, lists of businesses and their IRS employer identification numbers, 21 prepaid debit cards (of the sort issued for tax refunds) in the names of different people, plus completed and blank application forms for an organization called "Professional Legal and Economic Associates" (or "PLEA"). The application forms ask for, among other things, the applicant's full name, date of birth, social security number, driver's license number, and prison release date.

In November 2011, Kuntsman applied for and received a search warrant for a United Parcel Service ("UPS") box in Minneapolis, Minnesota, which had been listed on some of the forms found in the hotel room. IRS agents tracked down and interviewed a homeless man who Procknow had paid to open the UPS box. In May 2012, Kuntsman sent administrative summonses to several financial institutions requesting information about accounts held by Procknow and suspected victims and aliases. During a one-week period in June of

2012, the following three events occurred in rapid succession: a grand jury in the Western District of Wisconsin issued a subpoena to Procknow's bank requesting all account information for Procknow;[3] Kuntsman retracted the administrative summonses, returned all documents he had received pursuant to the summonses, and destroyed all copies made of that evidence; and the U.S. Attorney's Office for the Western District of Wisconsin sent a letter to the IRS informing the agency that the office was conducting an investigation against Procknow and requesting that an IRS agent be assigned to the investigation. On July 23, 2012, the IRS agreed to the request, and on February 1, 2013, the IRS sent a letter to the U.S. Attorney's Office, transmitting the case and officially recommending prosecution.

Later in 2013, the grand jury returned an indictment, and then a superseding indictment, charging Procknow with 22 counts of making false claims against the United States, 18 U.S.C. § 287, five counts of theft of government money, *id*. § 641, and five counts of aggravated identify theft, *id*. § 1028(a)(1). According to the presentence report, these charges related to Procknow's scheme to fraudulently obtain the personal identifying information of at least 40 individuals and use the information to prepare and file fraudulent tax returns and claim fraudulent refunds. Procknow created "PLEA," a sham organization, and mailed PLEA applications to inmates across the country claiming to help "inmates

---

[3] In April 2011, the same bank had alerted local and federal authorities of suspicious activity in Procknow's account. According to the bank, at least five different federal tax refunds in three different names (not "Procknow") had been deposited into Procknow's account.

seek legal assistance for both criminal and civil actions," and offering inmates two free magazine subscriptions simply for filling out and returning the application to Procknow's UPS box in Minneapolis. Using the personally identifiable information gleaned from the PLEA applications, Procknow filed tax returns claiming fraudulent refunds totaling $124,302.00, of which $42,646.78 was disbursed into Procknow's personal bank accounts or in the form of prepaid debit cards sent to Procknow.

On September 13, 2013, Procknow moved to suppress all evidence discovered as a result of EPD officers' entry into the Extended Stay hotel room, as well as evidence obtained using the grand jury subpoenas. After a hearing, the magistrate judge issued a report to the district judge pursuant to 28 U.S.C. § 636(b)(1)(B)–(C), proposing findings and recommending that the motion be denied. The district court adopted the majority of the proposed findings and denied the motion. Procknow thereafter entered a conditional guilty plea to two counts of the superseding indictment, preserving his right to appeal the denial of the motion to suppress. The district court sentenced Procknow to three years of imprisonment and three years of supervised release, and ordered restitution in the amount of $42,646.78.

## II.    DISCUSSION

Procknow contends that the district court erred in denying his motion to suppress because the EPD's initial warrantless entry into Extended Stay room 315 violated his Fourth

Amendment rights.[4] Procknow argues that he had a legitimate expectation of privacy in the room because he was a guest of Van Krevelen, the registered occupant of the room. The government counters that Procknow did not have a legitimate expectation of privacy due to his status as an absconder from supervised release who failed to register for the hotel room, in contravention of Minnesota law and hotel policy, in order to evade law enforcement.

The question of whether a search is reasonable pursuant to the Fourth Amendment "turns in large part on the extent of [a defendant]'s legitimate expectations of privacy." *United States v. White*, --- F.3d ----, No. 13-2943, 2015 WL 1323343, at *3 (7th Cir. Mar. 25, 2015). We have recently had occasion to consider the legitimate expectations of privacy of parolees, which may be "significantly diminished" but not necessarily eliminated by their conditions of parole. *Id*. at *4; *see also United States v. Walton*, 763 F.3d 655, 660 (7th Cir. 2014) ("The government rightly points out that Walton's expectation of privacy was reduced due to the fact he was a parolee. But the Supreme Court has expressly declined to hold that a parolee categorically has no expectation of privacy in any context." (citing *Samson v. California*, 547 U.S. 843, 850 n.2 (2006))). However, we see no need to delve into the issue of whether, as a general matter, a fugitive hiding from law en-

---

[4] The search warrant that EPD officers later obtained for the room was based in large part upon materials the officers saw during their initial, warrantless entry into the room. Procknow contends that the legality of the warrants is dependent upon the legality of the officers' initial, warrantless entry into the room—a contention we accept for the purposes of this appeal.

forcement has any legitimate expectation of privacy in a ho-
tel room in which he is staying as an unregistered guest.
This is because any legitimate expectation of privacy Prock-
now may have had in the hotel room was extinguished
when he and Van Krevelen were justifiably ejected from the
hotel following their arrests and prior to the officers' entry
into the room.

"A hotel room can clearly be the object of Fourth
Amendment protection as much as a home or an office."
*Hoffa v. United States*, 385 U.S. 293, 301 (1966). "Fourth
Amendment protection, however, is dependent on the right
to private occupancy of the room since at the conclusion of
the rental period, the guest has completely lost his right to
use the room and any privacy associated with it." *United
States v. Akin*, 562 F.2d 459, 464 (7th Cir. 1977) (quotation
omitted). "[C]ourts recognize that motel and hotel tenancy is
ordinarily short-term. If the tenancy is terminated for legiti-
mate reasons, the constitutional protection may vanish." *Fin-
sel v. Cruppenink*, 326 F.3d 903, 907 (7th Cir. 2003); *see United
States v. Molsbarger*, 551 F.3d 809, 811 (8th Cir. 2009) ("Justifi-
able eviction terminates a hotel occupant's reasonable expec-
tation of privacy in the room."); *United States v. Allen*, 106
F.3d 695, 699 (6th Cir. 1997) ("Once 'a hotel guest's rental pe-
riod has expired or been lawfully terminated, the guest does
not have a legitimate expectation of privacy in the hotel
room.'" (quoting *United States v. Rahme*, 813 F.2d 31, 34 (2d
Cir. 1987))); *United States v. Rambo*, 789 F.2d 1289, 1295–96
(8th Cir. 1986) (holding that after a suspect was justifiably
ejected from his hotel room for disorderly behavior, he "no
longer had a reasonable expectation of privacy in the hotel
room"). "At the conclusion of the occupancy period, the ho-

tel manager may enter the room or consent to its search." *Akin*, 562 F.2d at 464.

The district court found that "hotel staff determined that Procknow and Van Krevelen were no longer welcome and terminated their stay." We review this factual finding for clear error. *See White*, 2015 WL 1323343, at *2. Procknow contends that the "evidence is equivocal" as to whether the hotel terminated their stay, noting that Schuelke, the front-desk clerk, contradicted the testimony of Scheler, the hotel manager, and the EPD officers on this point. However, both the district judge and the magistrate judge thoroughly evaluated the evidence presented at the suppression hearing, and we find no basis to disturb the district court's factual finding that the hotel terminated Procknow's and Van Krevelen's occupancy. *See United States v. Terry*, 572 F.3d 430, 434–35 (7th Cir. 2009).

Moreover, we find that the termination of their occupancy—"ejection," as it is known in Minnesota, Minn. Stat. § 327.73—was justified pursuant to Minnesota law. Minnesota innkeepers may eject "a guest or other person who … causes or threatens to cause a disturbance," *id*. § 327.73(1)(a)(2), or "violates any federal, state, or local laws, ordinances, or rules relating to the hotel," *id*. § 327.73(1)(a)(5), or "violates a rule of the hotel that is clearly and conspicuously posted at or near the front desk and on the inside of the entrance door of every guest room," *id*. § 327.73(1)(a)(6). Procknow's decision to flee from Officer Ondrey led to Procknow's dramatic and violent arrest in the hotel lobby, which undoubtedly caused a disturbance in contravention of § 327.73(1)(a)(2) and hotel policy posted at the front desk, printed on the registration card, and provid-

ed in a brochure given to all guests. Procknow's failure to register at check-in and his failure to register his vehicle likewise contravened Minnesota law, *see id*. § 327.10, as well as posted hotel policy. Officers informed hotel staff of Procknow's and Van Krevelen's arrests, thus informing hotel staff that the duo was suspected of violating the law, in contravention of § 327.73(1)(a)(5) and posted hotel policy. In short, hotel management had ample grounds to eject Procknow and Van Krevelen, and the officers were aware of this fact.

Procknow contends that any ejection was not effective under Minnesota law at the time that the officers entered room 315 because the hotel had not yet refunded the advance online-payment Procknow and Van Krevelen made for the room. *See id*. § 327.73(1)(b) ("If the guest has paid in advance, the innkeeper shall tender to the guest any unused portion of the advance payment at the time of removal."). The only published authority addressing the Minnesota innkeepers' statute in this context has ignored the refund provision. *See Rambo*, 789 F.2d at 1295–96; *State v. Perkins*, 588 N.W.2d 491, 492–93 (Minn. 1999). Although the refund provision likely would be relevant in a civil action brought by Procknow or Van Krevelen against the hotel seeking a refund of the unused portion of the advance payment, we do not find it relevant in the present context. There is no evidence that the EPD officers were aware that the room had been prepaid (as opposed to payable at check-out) or that the hotel had failed to refund the credit card used to pay for the room at the time the hotel terminated their occupancy. Instead, the facts found by the district court adequately demonstrate that the officers *reasonably believed* that Procknow and Van Krevelen had been justifiably ejected, and this

is sufficient for Fourth Amendment purposes. *See United States v. Richards*, 741 F.3d 843, 850 (7th Cir. 2014) ("Even without actual authority, however, a warrantless search may still be permissible if consent is obtained from a third-party with apparent authority. When determining whether an individual has apparent authority to consent, the court employs an objective standard; officers may conduct a search without a warrant if they 'reasonably (though erroneously) believe' that the person consenting had authority over the premises." (citations omitted) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990))).

Thus, Procknow's and Van Krevelen's justifiable ejection (or at least the officers' reasonable belief on this point) extinguished any legitimate expectation of privacy Procknow may have had in room 315, and authority (or apparent authority) to consent to entry into room 315 thereby reverted to the hotel. *See Molsbarger*, 551 F.3d at 811; *Finsel*, 326 F.3d at 907; *Rambo*, 789 F.2d at 1295–96; *Akin*, 562 F.2d at 464. The district court found that, after the ejection, hotel management asked the EPD officers to enter room 315 for the purpose of clearing the room of the dog and any other unregistered occupants. This finding—while not necessary to our holding since Procknow's expectation of privacy had vanished—was not clearly erroneous. We conclude that the district court did not err in denying Procknow's motion to suppress the evidence obtained from the hotel room.[5]

---

[5] We do not need to reach the government's alternative argument that the officers' entry into the hotel room was a legitimate exercise of the police's "community caretaking" function, a doctrine which we have heretofore "limited … to automobile searches." *Sutterfield v. City of Mil-*

We now turn to Procknow's contention that the district court erred in denying his motion to suppress the evidence obtained by grand jury subpoena, which Procknow contends was tainted by the earlier IRS administrative summonses. Procknow argues that the IRS acted in bad faith because it issued the administrative summonses for the sole purpose of furthering a criminal investigation. The government responds that, because it is undisputed that there was no Department of Justice referral in effect when the summonses were sent, the use of administrative-summons power for criminal investigation was proper. To understand these arguments, some background is necessary.

In 1978, the Supreme Court decided that the IRS may not validly issue an administrative summons (also known as a "civil summons") for the sole purpose of a criminal investigation, even if the criminal investigation had not yet been referred to the Department of Justice for prosecution. *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 317 (1978). In 1982, Congress amended the statute governing administrative summonses in two ways. First, Congress added a section providing that the IRS may issue summonses for "the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws." 26

---

*waukee*, 751 F.3d 542, 555 (7th Cir.), *cert. denied*, 135 S. Ct. 478 (2014). We note, though, that it would seem to be a peculiar result if officers were prohibited from assisting a hotel in removing an abandoned dog from the premises. *Cf.* Minn. Stat. § 343.29(1) (providing that a peace officer "may remove, shelter, and care for any animal … not properly fed and watered, or provided with suitable food and drink in circumstances that threaten the life of the animal").

U.S.C. § 7602(b). Second, Congress dictated when the IRS's administrative-summons authority ends: "No summons may be issued under this title … with respect to any person if a Justice Department referral is in effect with respect to such person." *Id*. § 7602(d)(1).

A majority of circuits have held "that the IRS may validly issue a summons pursuant to 26 U.S.C. § 7602, as amended in 1982, for the sole purpose of a criminal investigation," and the 1982 amendment to § 7602 established a bright-line rule that "the IRS's authority to issue summonses for the purpose of investigating any offense relating to the tax code is extinguished only when the investigation is referred to the Department of Justice." *Scotty's Contracting & Stone, Inc. v. United States*, 326 F.3d 785, 788–89 (6th Cir. 2003) (collecting cases). In 1990, prior to consideration of the issue by many other circuits, we noted: "There is some debate as to whether this 'solely criminal purpose' ground discussed in *LaSalle* survived the 1982 amendments to § 7602, and specifically the addition of § 7602(b). … [W]e need not, and do not, resolve this debate here." *United States v. Michaud*, 907 F.2d 750, 752 n.2 (7th Cir. 1990) (en banc); *compare id*. at 754 n.1 (Coffey, J., concurring) (stating that the holding in *LaSalle* was unaffected by the 1982 amendment to § 7602), *with id*. at 757 (Posner, J., dissenting, joined by three other judges) (stating that the court should find that the 1982 amendment to § 7602 established a bright-line rule that "[b]efore referral, the IRS is free to use the summons procedure to investigate potential criminal liability"). Later, we cited *Michaud* in support of the statement that the IRS "cannot use its summons authority if its only purpose is to gather evidence for a criminal investigation." *United States v. Berg*, 20 F.3d 304, 309 n.6 (7th Cir. 1994).

Procknow relies upon *Michaud* and *Berg* to argue that "whether or not the civil summonses were issued prior to the DOJ referral is not the only relevant inquiry—a more important inquiry is whether the civil summonses were issued for the sole purpose of a criminal investigation or prosecution." Meanwhile, the government contends that "[t]he best reading of Section 7602 is the one adopted by the majority of circuits and urged by the dissenters in *Michaud*," which is to say, "[a]s long as no Justice Department referral is in effect, the use of administrative summons power for criminal investigation is proper." But before we wade further into this murky issue, we pause to consider what might await us on the other side—i.e., what remedy is available to Procknow if we were to find that the administrative summonses were improperly issued.

In *Michaud*, the remedy under consideration was quashing the summonses. 907 F.2d at 751. This remedy does not advance Procknow's cause because all of the administrative summonses were withdrawn and all evidence received from the summonses was returned or destroyed. Procknow instead argues that the appropriate remedy here is to suppress all evidence derived from grand jury subpoenas issued after the administrative summonses.

"[T]he federal exclusionary rule, which forbids the use of evidence obtained in violation of the Fourth or Fifth Amendments, does not extend to violations of statutes and regulations." *United States v. Kontny*, 238 F.3d 815, 818 (7th Cir. 2001); *see United States v. Caceres*, 440 U.S. 741, 755 (1979) (holding that the failure of an IRS agent to follow IRS electronic surveillance regulations did not require suppression of tape recordings in prosecution of taxpayer). However,

"[i]n theory," a "valid argument for suppression" could be made if the government's use of "administrative measures that do not require probable cause … undermin[ed] the Fourth Amendment's probable cause requirement." *United States v. Utecht*, 238 F.3d 882, 886 (7th Cir. 2001). Procknow offers just such an argument (i.e., "Agent Kuntsman used an IRS civil summons to circumvent probable cause and due process requirements"), but the record does not contain facts to support it. Procknow offers no basis to disturb the district court's finding that "Procknow did not … prove any actual misuse of information obtained from these summonses" (or, as stated by the magistrate judge, "[t]he IRS obtained no information from the summonses").

*Utecht*, and every other case relied upon by Procknow which contemplates suppression as a remedy, did so in the context of suppressing evidence *directly derived* from administrative summonses. Here, since all evidence directly derived from the summonses was returned or destroyed, Procknow must claim, as he does, that "the information obtained from improperly issued civil summonses taints the evidence obtained from the subsequent grand jury subpoenas." But merely claiming the evidence is tainted does not make it so. The record simply contains no indication that the grand jury subpoenas were in any way affected by the evidence derived from the administrative summonses. Indeed, Procknow failed to subpoena IRS agent Kuntsman—the most likely source of information on this topic—to appear at the evidentiary hearing on the motion to suppress. And Procknow offers no challenge to the grand jury subpoenas in isolation. *Cf. United States v. R. Enters.*, 498 U.S. 292, 300 (1991) ("[T]he law presumes, absent a strong showing to the

contrary, that a grand jury acts within the legitimate scope of its authority.").

Even if we were to insist upon a showing of probable cause in this situation, the government has shown that, prior to the issuance of the administrative summonses or the grand jury subpoenas, the authorities had adequate probable cause to believe Procknow was involved in stolen-identity refund theft. The authorities had a wealth of information on this score obtained (legally, as we have just held) from the search of Procknow's hotel room, as well as the April 2011 suspicious-activity report by Procknow's bank of five deposits into Procknow's account of tax refunds in three different names. We cannot say that the use of the withdrawn administrative summonses circumvented any probable cause requirement or otherwise violated Procknow's constitutional rights. Accordingly, even if the IRS issued the summonses in contravention of § 7602, suppression of the evidence derived from the grand jury subpoenas would not be the appropriate remedy. *See Caceres*, 440 U.S. at 754–55 ("In view of our conclusion that none of respondent's constitutional rights has been violated here, either by the actual recording or by the [IRS's] violation of its own regulations, our precedents enforcing the exclusionary rule to deter constitutional violations provide no support for the rule's application in this case.").

We conclude that the district court did not err in denying Procknow's motion to suppress. The district court's judgment is AFFIRMED.